

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-11-00704-CR

Carlos **ZUNIGA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 79th Judicial District Court, Jim Wells County, Texas
Trial Court No. 09-04-12605-CR
Honorable Richard C. Terrell, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Rebecca Simmons, Justice

Delivered and Filed:  December 28, 2012

AFFIRMED

A jury convicted appellant, Carlos Zuniga, of murder, and assessed punishment at thirty years' confinement. On appeal, appellant asserts the indictment provided inadequate notice, he was entitled to an accomplice witness instruction, the trial court applied the wrong standard to his motion for new trial, the evidence in support of the verdict is legally insufficient, and the trial court erred in refusing to allow the contents of a letter to the Mexican Consulate into evidence. We affirm.

## THE INDICTMENT & SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant asserts he did not receive adequate notice of the offense charged because there was a variance between the offense charged in the indictment and the proof at trial. In his third issue, appellant asserts the evidence is insufficient to support the verdict.

Appellant was indicted as follows:

[Appellant] on or about the 16th DAY OF JUNE, A.D., 1991, and anterior to the presentment of this Indictment, in Jim Wells County and State of Texas, did then and there intentionally cause the death of an individual, namely, APRIL ANN REPKA, by stabbing her with a knife or an unknown sharp object, and [appellant] was then and there in the course of committing the offense of robbery against APRIL ANN REPKA.[1]

The evidence at trial showed the following. In June 1991, April Repka lived with her grandmother (Ann Jurena), had just graduated from high school, and received a graduation ring from her father. April planned to attend Del Mar College in Corpus Christi. On June 20, 1991, April's father reported her as missing.

In May 2004, a farmer in Jim Wells County found skeletal remains on his property. In May and June 2004, a human skull, other bones, and bracelets were recovered from the property in brush close to a fence line. The remains were turned over to the Nueces County Medical Examiner's Office. In 2008, at the request of the Jim Wells County Sheriff's Office, an FBI Evidence Recovery Team searched the property again and located more human remains, a ring, watch, and bracelet. The items were delivered to the custody of Anthony Daniel, a criminal

---

[1] The jury charge instructed the jury that if it found appellant guilty of intentionally causing April's death in the course of committing or attempting to commit a robbery of her car, then the jury should find appellant guilty of capital murder. The jury charge also instructed the jury that if it found appellant guilty of intentionally causing April's death, but had a reasonable doubt as to whether appellant was in the course of committing or attempting to commit a robbery of her car, then the jury should find appellant guilty of murder. The jury found appellant guilty of murder.

investigator for the Victoria County Sheriff's Department. Eventually, through DNA and dental testing, the human remains found in the field were identified as April's.

In 2007, before April's remains were identified, Anthony Daniel had been assigned April's missing person's case. During his investigation, Daniel developed an interest in Victor Ortiz, a friend of April's. He first attempted to locate Ortiz in Mexico. Ortiz was eventually located in Florida, where he was being held under a Texas arrest warrant for aggravated robbery of Jurena. While in custody in Florida, Ortiz said he would give a statement about how April was killed, but he would not provide any names until his return to Texas. He only said "two guys took April in the car and they left me behind, and they were gone for about an hour, and they came back without April. And when I asked them what happened to April, they told me, 'We killed the bitch.'" Once in custody in Texas, Ortiz told a different story, this time implicating appellant in April's death.

Ortiz's testimony is the only evidence the State adduced tying appellant to April's murder. At trial, Ortiz said he met April in either 1990 or 1991 when they were both at the same high school, and that April was a friend of his sister, Genoveva Ortiz. He was sixteen or seventeen years old at the time and younger than April. Ortiz and appellant were friends, appellant was several years older than Ortiz, and the two lived near each other. Ortiz thought appellant met April near the end of 1990. On June 16, 1991, Ortiz and April planned a trip by car to Corpus Christi, where they intended to rent an apartment together to share expenses, although they were not romantically involved. They both had personal belongings in the car, and April had money in a small can she hid under her car seat. Ortiz drove the car, which belonged to April's grandmother. Before heading to Corpus Christi, Ortiz and April decided to drive to

appellant's house in Robstown, Texas. Appellant asked Ortiz and April to drive him to Alice, Texas, where his brother, Joe Zuniga, lived.

When they arrived at Joe's house, he was not at home. Ortiz could not remember if they got out of the car, but he thought they probably did. Once back in the car—Ortiz driving, April in the front passenger seat, and appellant behind her in the back seat—April discovered her money was not inside the little can. April accused appellant of taking the money, which he at first denied. When April said she would call the police, appellant tried to calm her down by telling her he would return the money if they allowed him to drive to a store. April agreed, and appellant got into the driver's seat, while Ortiz got into the back seat behind April. Appellant drove them to a field, where he said he needed to urinate. Appellant got out of the car, walked around the back to the front passenger side, opened the door, grabbed April by her hair, and started hitting her. Ortiz got out of the car and told appellant to stop, at which point, "all of a sudden [appellant] took a knife out and hit her with the knife, and I got scared and I ran."

Appellant ran after Ortiz, holding the knife in his hand, knocked Ortiz down, and kicked him several times. Ortiz, who said he weighed about ninety-five pounds at the time and appellant was a bigger man, curled up into a ball. Ortiz then saw appellant go back to April who was kneeling, with her head down and crying. Ortiz said he was 150 to 200 feet away from her. He said appellant "went back, he grabbed the knife and started hitting her around the neck area." When asked what he meant by "hitting her," Ortiz explained, "Well, I believe at that time he was hitting her because I couldn't see any blood, and I never never saw blood, so I didn't know if he was hitting her with the back side of the knife or the front." Ortiz said he was scared, crying, and had his head between his legs, but when he looked up, he "saw April fall back after [appellant]

struck her around the neck and chest area a few times." He said April fell back and he could not see her because the grass was too high. He then put his head back down.

A few minutes later, Ortiz looked up and saw appellant near a fence where he assumed appellant had dragged April. Appellant was standing over April and making the sign of the cross; he appeared to be praying. "And he did it like ten times." Ortiz said appellant then got into the car, backed it up towards him, and said, "Get in, coward." When asked why he got into the car after appellant had just killed April, Ortiz said he "felt scared enough to do what he said." Ortiz said there was a light rain and appellant said, "God is crying because somebody had to die."

Appellant drove them to his brother Joe's apartment in Alice, Texas. Appellant removed April's and Ortiz's possessions from the car and gave them to Joe. Joe threatened Ortiz with a knife, telling him to never speak about what happened. Appellant drove Ortiz to within a few blocks of Ortiz's house and left him. Ortiz said appellant also threatened him and said he would kill Ortiz's father and sister if Ortiz ever told anyone about what happened. When asked if he believed appellant's threat, Ortiz responded, "I just saw him kill April, and I did believe him." Appellant kept the car.

On cross-examination, Ortiz again explained that when he got out of the car and told appellant not to hit April, "everything was happening so fast that by the time I knew it, he had already hit her one time with the knife. And I say hit her, not stab her, because I never saw blood. And that's what made me think he was hitting her with the back side of the knife." Ortiz described the knife as having a folding blade, a white handle, and as being six to eight inches long.

The medical examiner, Dr. Rey Fernandez, testified the bones had been in place "for a prolonged period of time . . . consistent with years." He said the cause and manner of death could not be determined. The State also offered into evidence an anthropological report prepared by Dr. H. Gill-King, which estimated April's remains had been in place "an interval of 5 to 15 years, perhaps somewhat longer."

Ortiz said that after the murder, appellant would occasionally contact him because appellant wanted to know what was happening and he wanted to know what, if anything, April's grandmother, Ann Jurena, knew. On one of these occasions, in February 1992, appellant suggested he and Ortiz go to Jurena's house to find out what she knew and to ask her for money to buy beer. Ortiz said that, once at Jurena's house, appellant "asked Ann for some money because April was in need of it and that he would make sure that she get [sic] it. Ann didn't fall for it, she didn't want to give him anything." Ortiz said appellant got angry and pulled out a knife and made him and Jurena's grandson (who was also present) kneel down. He forced Jurena to write two checks. Ortiz said appellant held a knife to his back because he "never cooperated on taking the — the check." Appellant and Ortiz then left Jurena's house, and Ortiz said he cashed one of the checks. After his return to Texas from Florida, Ortiz pled guilty, pursuant to a plea bargain, to aggravated robbery of Jurena, and he was placed on deferred adjudication community supervision for seven years. The plea bargain required Ortiz to "cooperate and testify truthfully in any court proceeding regarding Carlos Zuniga [and] contact Investigator, Tony Daniel every Friday from a landline." Ortiz said he pled guilty to aggravated robbery because he "did something that was not right [by cashing the check]."

## A.    Notice and the Indictment

On appeal, appellant contends the State proved an entirely different offense, death by bludgeoning instead of death by stabbing.  Appellant asserts that, based on the indictment, he was prepared to defend against the allegation that he stabbed April, but, because the indictment did not provide him with sufficient notice that the State would prove only death by bludgeoning, he was deprived of a fair opportunity to defend himself.  We disagree both with appellant's argument and his characterization of Ortiz's testimony as only proving death by bludgeoning.

A variance in pleading and proof can occur in two ways.  *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012).  First, a variance can involve the statutory language that defines the offense, such as when a statute specifies alternate methods by which an offense could be committed, the charging instrument pleads one of those alternate methods, but the State proves, instead, an unpled method.  *Id.*  "For example, the retaliation statute makes it a crime to threaten a 'witness' or 'informant.'"  *Id.*  "The first type of variance occurs if the State pleads only 'witness' in the charging instrument and proves only the unpled element of 'informant' at trial."  *Id.*  Second, a variance can involve a non-statutory allegation that is descriptive of the offense in some way, such as when the charging instrument pleads the offense was committed with a knife, but the State proves at trial that a baseball bat was used.  *Id.*

Courts tolerate some variation in pleading and proof for non-statutory allegations, such as the one alleged in this case.  *Id.* at 295.  "We tolerate 'little mistakes' that do not prejudice the defendant's substantial rights but we will not tolerate a variance that really amounts to a failure to prove the offense alleged."  *Id.*  "What is essential about variances with respect to non-statutory allegations is that the variance should not be so great that the proof at trial 'shows an entirely different offense' than what was alleged in the charging instrument."  *Id.*  "For example,

in a murder prosecution, the victim's name need not be proved with exactness, but the State must prove that the victim alleged in the indictment is the same person as the victim proved at trial." *Id.* "The key to this conclusion is that each victim is an allowable unit of prosecution for the offense of murder." *Id.* "If there are multiple murder victims, the State may obtain multiple murder convictions." *Id.* at 295-96. Therefore, the murder of one individual is a different offense from the murder of a different individual. *Id.* at 296. "But some types of facts—such as the method by which a murder is committed—do not relate at all to the allowable unit of prosecution." *Id.* "The State could allege 'poisoning, garroting, shooting, stabbing, or drowning,' of a single individual, and those different acts would simply be alternate methods of committing a single offense." *Id.* "With only one victim, there can be only one murder, regardless of how that murder is committed." *Id.*

In this case, the alleged variance involves a non-statutory allegation that has nothing to do with the allowable unit of prosecution and, therefore, cannot be a basis for saying that the proved offense is different from the one that was pled. "'Stabbing with a knife' and 'bludgeoning with [the knife]' are two possible ways of murdering [April], but they do not constitute separate offenses." *Id.* at 298. Although these methods of committing murder describe an element of the offense—the element of causation—murder is a result-of-conduct crime. *See id.* What caused a person's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the person was killed. *See id.* "Variances such as this can never be material because such a variance can never show an 'entirely different offense' than what was alleged." *Id.*

Here, appellant was charged with intentionally causing April's death. The variance alleged by appellant involves the charged act of "stabbing" April with a knife or sharp object

versus "bludgeoning" April with a knife. But, contrary to appellant's contention, Ortiz did not testify that appellant "bludgeoned" April. Instead, Ortiz testified that appellant "hit April around the neck and chest area a few times," and he explained he thought appellant "was hitting her because I couldn't see any blood, and I never never saw blood, so I didn't know if he was hitting her with the back side of the knife or the front." Ortiz also said that once April fell back, he could not see her anymore because the grass "was kind of high," and he was 150 to 200 feet away. Ortiz testified that "when [appellant] took the knife out, he kind of went like this on her, on the chest, a couple of times. And I never saw blood, so I figured that he was only hitting her, it was only, you know, just a — like a punch, not — not a stabbing. But I never saw blood, not even after — after he had knocked me down, I had run, I never saw the blood, never." Ortiz said he ran 150 to 200 feet away, and he did not see blood from that distance.

Ortiz's testimony describes the causation element of the offense. "What caused [April's death] is not the focus or gravamen of this offense." In a result-of-conduct crime, such as intentional murder, the culpable mental state focuses on the result of the conduct. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "The precise act or nature of conduct in this result-oriented offense is inconsequential." *Johnson*, 364 S.W.3d at 298. Because the act that caused April's death does not define or help define the allowable unit of prosecution for this type of offense, the alleged variance cannot be material. *Id.* (holding same in aggravated assault case where variance involved the charged acts of "hitting the victim with his hand" and "twisting the victim's arm with his hand" versus the proved act of "throwing the victim against the wall"). Immaterial non-statutory variances do not render the evidence legally insufficient. *Id.* at 299. We conclude the variance, if any, is not so great that the proof at trial showed an entirely different offense than what was alleged in the charging instrument.

Appellant concedes the alleged variance here is immaterial, but he relies on the following footnote in *Johnson* as support for his argument that the variance is great enough to implicate notice: "We do not address whether a variance under this third category [other types of variances involving immaterial non-statutory allegations] could be significant enough to warrant a new trial based upon lack of notice." *See id.* n.47. Appellant contends his attorney would have asked the medical examiner different questions if he had known the State would prove bludgeoning. For example, appellant contends his trial counsel would have asked the medical examiner whether the skeleton of someone beaten to death by a knife would show signs of trauma, whether any trauma on the skeleton corresponded to the details of a bludgeoning, and whether the "beating described by [Ortiz] could prove fatal to a healthy woman." However, defense counsel did not ask any similar questions based on death by stabbing.

The medical examiner testified the cause and manner of death could not be determined. When asked whether he could draw any conclusion from the skeletal remains, Fernandez repeated that cause of death could not be determined. On cross-examination, Fernandez also admitted he did not have a complete skeleton, some of the bones had been heavily scavenged, and he could not rule out death by natural causes, suicide, or by accident such as accidental poisoning or being hit by a train. Despite having an almost intact skull, no questions were asked about the type of damage a stabbing would have inflicted on the skull. While it is true counsel did not question Fernandez about a "bludgeoning," he also did not question Fernandez about the signs of a stabbing.

Because the medical examiner admitted the manner and cause of death could not be determined, and because defense counsel did not examine the medical examiner about any

manner of death, we do not believe appellant's complaint that the variance was significant enough to warrant a new trial based on lack of notice has merit.

## B. Sufficiency of the Evidence

Appellant asserts the State presented no evidence of an intentional murder that occurred on June 16, 1991. According to appellant, the State presented, at most, evidence only of an assault. Because murder is a result-of-conduct offense, the question is not whether appellant's conduct was intentional or knowing; the question is whether the result of that conduct, i.e., April's death, was intentional or knowing.

To prove appellant committed murder, the State was required to show appellant intentionally or knowingly caused April's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her death. TEX. PENAL CODE ANN. § 19.02(b) (West 2011). The Penal Code defines the culpable mental states as follows:

> (a) A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
> (b) A person acts knowingly with respect to the nature of his conduct or the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 6.03(a), (b).

In our review of the evidence, we ask whether the jury could have rationally determined beyond a reasonable doubt from the totality of the circumstantial evidence viewed in a light most favorable to its verdict that appellant intended to cause April's death. *See Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *Brooks v. State*, 323 S.W.3d 893, 895, 899 (Tex. Crim. App. 2010). Intent is most often proven through the circumstantial evidence surrounding the crime, and the jury may infer the requisite intent from the acts, words, and conduct of the accused, and the

method of committing the crime and the nature of the wounds inflicted on the victim. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring); *see also Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted on a helpless victim, can be probative on the issue of intent or knowledge. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Juries are also permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). Under the *Jackson* standard, we must determine "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* at 16-17.

Here, the record reveals that in June 1991, appellant dragged April from the car by her hair, repeatedly "hit" April with a knife, moved her body to a fence line, stood over or near her body making the sign of the cross, appeared to be praying, and he told Ortiz, "God is crying because somebody had to die." Fernandez testified the death occurred a number of years before April's skeletal remains were discovered in 2004. King's forensic report states April's remains were in the field for an interval of five to fifteen years, perhaps longer, placing April's death as early as 1989. Viewing the evidence in a light most favorable to the verdict, we conclude a rational jury could have found beyond a reasonable doubt that appellant intentionally or knowingly killed April on June 16, 1991.[2]

---

[2] Appellant also challenges the sufficiency of the evidence by arguing Ortiz's testimony was "divorced from reality" and "a rational jury could not have relied on Ortiz's testimony to convict" appellant. Along these same lines, appellant also contends the jury was not rational. Neither argument has merit. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of witness credibility and weight of the evidence, and may not substitute our judgment for that of the fact finder. *See Brooks*, 323 S.W.3d at 899; *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal

Appellant also asserts Ortiz was the functional equivalent of an accomplice or a jailhouse snitch, and his testimony should have been, but was not corroborated. Therefore, according to appellant, Ortiz's testimony should have been excluded, and without his testimony, the evidence is insufficient to support the verdict. However, for the reasons explained below, we do not believe Ortiz was an accomplice whose testimony necessitated corroboration.

## ACCOMPLICE WITNESS

Appellant asserts the trial court erred in not giving him an accomplice witness instruction. According to appellant, Ortiz was present during all stages of the crime—during the car ride, throughout the offense itself, and during Jurena's robbery—therefore, he is an accomplice as a matter of fact. Appellant argues that Ortiz's "self-implication in the Jurena robbery provides the proper inference for the jury to find that Ortiz [was] an accomplice in" April's murder. Appellant's logic is that without Ortiz's name on the check written by Jurena, the State could not indict him; without an indictment, the State could not secure a plea bargain; without a plea bargain with Ortiz, the State could not convict appellant.

A conviction may not be based upon the testimony of an accomplice unless that testimony is corroborated by other non-accomplice witness evidence that tends to connect the defendant to the crime. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). A witness may be an accomplice either as a matter of law or as a matter of fact; the evidence in a case determines which jury instruction, if any, needs to be given. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). A trial court is obligated to instruct the jury that a witness is an accomplice as a matter of law only if there is no doubt that the witness is an accomplice. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). A matter-of-law accomplice instruction is appropriate

---

sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

when the witness is charged with the same offense as the defendant or with a lesser-included offense, or the evidence clearly shows that the witness could have been so charged. *Id.* If the evidence as to a witness's status as an accomplice is conflicting, the jury should determine whether the witness is an accomplice as a matter of fact under instructions defining an "accomplice." *Id.* at 498-99; *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998). However, there must be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required. *Druery*, 225 S.W.3d at 499. The trial court is not required to give the jury an accomplice witness instruction when the evidence is clear that the witness is neither an accomplice as a matter of law nor as a matter of fact. *Cocke*, 201 S.W.3d at 748.

"An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Druery*, 225 S.W.3d at 498; *see also Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). This participation must include an affirmative act in promotion of the commission of the offense with which the defendant is charged. *Druery*, 225 S.W.3d at 498; *Paredes*, 129 S.W.3d at 536. A witness is not an accomplice merely because the witness knew of the offense and did not disclose it, or even if the witness concealed the offense. *Druery*, 225 S.W.3d at 498. In addition, the witness's mere presence at the scene of the crime does not render that witness an accomplice witness. *Id.* And, complicity with a defendant in the commission of another offense separate from the charged offense does not make one an accomplice witness as to the charged offense. *Id.*

On appeal, as support for his argument, appellant points to (1) Ortiz's presence in the car during the ride to the field and his presence outside the car during the offense; (2) Ortiz did

nothing to stop or prevent April's murder; (3) Ortiz did not flee the scene during or after the incident; and (4) his presence during the robbery of Jurena. However, at no point did Ortiz take any affirmative act to assist in murdering April, and his mere presence at the scene of the murder, even coupled with his complicity with appellant in the later robbery of Jurena does not render him an accomplice witness. Therefore, we conclude the trial court was not required to give the jury an accomplice witness instruction because the evidence is clear that Ortiz is not an accomplice either as a matter of law or as a matter of fact. *See Cocke*, 201 S.W.3d at 748.

## MOTION FOR NEW TRIAL

Appellant moved for a new trial on the grounds that he was improperly denied an accomplice witness as a matter of fact jury instruction. Appellant's argument before the trial court differs somewhat from his argument above. At the new trial hearing, appellant's counsel argued there were two incidents that made Ortiz an accomplice. First, after the murder, Ortiz got back into April's car, which at this point in time neither he nor appellant had permission to take. Second, when he and appellant went to Joe Zuniga's apartment after the murder, Ortiz was left in the car "and in possession of the stolen property [April's personal possessions]." At this point, according to appellant's attorney, Ortiz was the only person in control of that stolen property and the only one in the car. Appellant's attorney conceded there was no evidence of an affirmative act on Ortiz's part as to the murder, but counsel argued Ortiz participated in the robbery of April's car and her personal possessions. Because the robbery was in the course of the murder, appellant concludes, Ortiz's status as an accomplice should have been submitted to the jury. Both at the hearing and on appeal, appellant asserts the Court of Criminal Appeals' decision in *Harris v. State*, 645 S.W.2d 447 (Tex. Crim. App. 1983), controls. On appeal, appellant contends the trial court abused its discretion by acting outside the guiding principles of *Harris*.

In *Harris*, the Court of Criminal Appeals reiterated the principal that if there is a conflict in the evidence the court should charge the jury on the question of whether the witness was an accomplice as a matter of fact. *Id.* at 456. The Court examined the record to determine whether there was a conflict in the evidence such that a jury could find that the juvenile witness was an accomplice as a matter of law. First, the Court observed conflicts in the juvenile's testimony at trial related to "consciousness of guilt." She admitted making prior statements that she believed she was guilty because she was "just a part of it as they were"; she first denied, then admitted she tried to escape custody; and she admitted no one forced her to remain with the killers after the murder and she could have gone home *Id.* at 456-57. Second, the Court noted that proceedings had begun to certify the juvenile for trial as an adult, but were not completed, and the juvenile testified she had a "deal" with the State, exchanging her testimony for a favorable sentencing recommendation. Third, the Court observed that the juvenile was "a witness whose testimony formed virtually the State's entire case against appellant, and one who had every reason to shade her testimony to downplay her own involvement in that offense." *Id.* at 457. Finally, the Court noted the juvenile's "role may have been less cut and dried and more culpable." *Id.* Her actions and testimony and the evidence as a whole, especially her action in taking possession of the victim's truck without permission or instruction by anyone, while the killing was still in progress, raised the fact issue of whether, prior to or contemporaneous with the criminal event, she was a party to the agreement to kill the deceased for his truck. *Id.* at 459. In conclusion, the Court stated the jury should have been charged on whether the juvenile was an accomplice and whether her testimony was corroborated.

This case is distinguishable from *Harris* because here, unlike in *Harris¸* Ortiz consistently testified appellant pulled April from the car by her hair, appellant "hit" April with

his knife, Ortiz tried to stop appellant before becoming scared and running away, and appellant said "somebody had to die." On this record, we conclude the trial court did not abuse its discretion in denying appellant's motion for a new trial.

## LETTER TO MEXICAN CONSULATE

In 2007, when Daniel was investigating April's missing person's case, he developed information that Ortiz was in Mexico. Daniel wrote a letter to the Mexican Consulate asking for assistance in locating Ortiz. In his final issue, appellant asserts the letter should have been admitted because it was not offered for the truth of the matter asserted, but instead, to show Daniel's interest in Ortiz and how Daniel was able to find Ortiz. Appellant argues the letter falls within an exception to hearsay because it showed Daniel's state of mind. Appellant also contends the trial court did not allow him to cross-examine Daniel about the letter.

First, appellant's attorney did not attempt to offer the letter into evidence. In fact, when defense counsel asked Daniel, "And it's the same Victor Ortiz that you referred to in your letter as having a warrant for his arrest," the prosecutor objected stating, "Your Honor, you've already ruled that the contents of that letter are not being [sic] admissible." Defense counsel replied, "I don't think the Court ruled that at all," and the trial court stated, "There hasn't been an offer on that, so I haven't made a ruling yet." Therefore, appellant's complaint that the trial court erred by not admitting the letter into evidence has no basis in the record.

In his reply brief, appellant contends his complaint regarding the letter has not been waived because he did not seek to admit the letter; instead, he sought to admit the *contents* of the letter. Appellant contends the trial court improperly ruled the contents of the letter as hearsay because the contents revealed Daniel's state of mind when he wrote the letter and implicated

Ortiz as Daniel's prime suspect in April's murder. We disagree with appellant's characterization of what happened at trial.

Appellant's attorney started to question Daniel about an interview he conducted with Ortiz's sister, Genoveva Ortiz. Genoveva had told Daniel she had seen April alive as late as 2001. When the State raised a hearsay objection, appellant's counsel stated that Genoveva's interview caused Daniel to focus his case on a missing person, and not a fatality, and this led Daniel to contact the Marshal's Service about locating Ortiz in Mexico, "because [Genoveva] believed April was still alive in Mexico with Victor Ortiz as late as March of 2007." The trial court excused the jury and allowed appellant's attorney to question Daniel about a February 6, 2007 conversation he had with Genoveva. When the State again raised a hearsay objection, appellant's attorney responded that what Genoveva told Daniel was not being offered for the truth of the matter asserted. Instead, he offered Daniel's testimony about the conversation "to demonstrate that this officer had other leads that he failed to follow-up on and opted for [the] easiest option, which was simply going after [appellant] . . . ." Following additional questions about Daniel's conversations with Genoveva, the court recessed for the day without making a ruling.

The next day, the trial court asked appellant's counsel if he wanted to question Daniel about the unavailability of Ortiz's sister, who was living in Florida. Counsel responded as follows: "Not so much about her unavailability, Your Honor, as to what she would have said, or what this witness [Daniel] would have said about what she — he was told as a bill of exception to the Court's ruling on our hearsay." The trial court again allowed counsel to question Daniel outside the jury's presence. Counsel began by showing Daniel the letter he had written to the Mexican Consulate, stating, "And in this letter you reference some things that you were told by

Genoveva Ortiz; is that correct?" Daniel replied affirmatively. In the letter, Daniel stated to the Consulate that, "It is apparent that Genoveva Ortiz has information about this case [April's case] she does not want to reveal." Counsel then proceeded to ask Daniel not about the contents of the letter, but instead, about what he believed Genoveva was not revealing to him about April's whereabouts. Following these questions, the trial court sustained the State's hearsay objection.

Except for the brief reference to the letter, at no time did counsel attempt to create a bill of exception about what questions he would have asked about the letter's contents. His questions were focused entirely on what Genoveva told Daniel. Therefore, appellant's complaint regarding the contents of the letter is waived. *See* TEX. R. APP. P. 33.2 ("To complain on appeal about a matter that would not otherwise appear in the record, a party must file a formal bill of exception.").

Appellant's complaint that the trial court did not allow cross-examination of Daniel about the letter also has no basis in the record. Defense counsel's examination of Daniel—with the jury present—about the letter and his reasons for writing the letter covers several pages of the reporter's record. Also, on appeal, appellant points to no bill of exception offered as to questions he was prevented from asking Daniel about the letter. Therefore, this complaint lacks merit.

## CONCLUSION

For the reasons stated above, we overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Publish