**Affirmed and Memorandum Opinion filed March 5, 2024**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00420-CR

**LOGAN LOSOYA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Cause No. 1651869**

## MEMORANDUM OPINION

A jury convicted appellant, Logan Losoya, of murder. Appellant timely brought this appeal raising three issues. In his first issue, he contends that the evidence is legally and factually insufficient to prove he murdered the complainant, Piper Jones. In his second and third issues, he argues that he is entitled to a factual sufficiency review under the Texas Constitution and under *Jackson v. Virginia*, 443 U.S. 307 (1979). We decline appellant's invitation to ignore extensive precedent from the Court of Criminal Appeals and this court on

factual sufficiency review and, concluding the evidence sufficient, affirm the judgment of the trial court.

## FACTUAL SUFFICIENCY REVIEW

In his second issue, appellant argues this court has authority under the Texas constitution to conduct a factual sufficiency review and that he is entitled to such a review. Appellant argues that under article five, section six, the Texas constitution provides that the "decision of [the Texas Courts of Appeals] shall be conclusive on all questions of fact brought before them on appeal or error, requiring the courts to make "a distinction between questions of law and questions of fact." Tex. Const. art. V, § 6(a). In appellant's third issue, he contends that the denial of a separate factual sufficiency review denies him of due process and equal protection. Appellant argues that by failing to conduct a separate factual sufficiency review, he is denied a "meaningful review" of whether the State has proved its case beyond a reasonable doubt. Appellant argues that when a reviewing court must limit its analysis to the evidence supporting the verdict, it can never reach the question of whether the State proved its case beyond a reasonable doubt because "[a] juror's doubt arises from consideration of all of the evidence, not just the State's evidence." Appellant contends that we must conduct a review of all of the evidence in a neutral light in order to evaluate whether a juror would have a reasonable doubt. Appellant further argues that it is troubling that "Texas still gives factual sufficiency review to civil cases, but not to most criminal cases" and such "disparate treatment" violates the equal protection clause of both the U.S. and Texas constitutions.

In *Brooks v. State*, a plurality of the Court of Criminal Appeals held that the factual sufficiency standard was indistinguishable from the legal sufficiency standard in *Jackson v. Virginia*. *Brooks*, 323 S.W.3d 893, 902 (Tex. Crim. App.

2

2010) (plurality op.); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court came to this conclusion because under the factual sufficiency standard, a court was to review all the evidence in a neutral light yet not substitute its own resolutions of conflicting evidence because the jury is still sole judge of evidentiary credibility and weight. *See id*. at 901–02. The court reasoned that leaving the judgments of evidentiary weight and credibility to the jury requires the court to review the evidence in the light most favorable to the verdict, thus making it indistinguishable from the standard of a legal sufficiency review. *See id*. at 902.

Since *Brooks*, the Court of Criminal Appeals has declined to conduct a separate factual sufficiency review. *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *Lucio v. State*, 351 S.W.3d 878, 895 (Tex. Crim. App. 2011). As an intermediate court of appeals, we are bound to follow the precedent of the Court of Criminal Appeals. *Ervin v. State*, 331 S.W.3d 49, 53–54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also* Tex. Const. art. V, § 5(a) (court of criminal appeals is final authority for criminal law in Texas). While an intermediate appellate court's decision "shall be conclusive on all questions of fact brought before them on appeal or error," the Court of Criminal Appeals has the authority to determine questions of law including the standard of review that an intermediate appellate court must use in conducting factual review. *See* Tex. Const. art V, § 6(a); *Roberts v. State*, 221 S.W.3d 659, 663 (Tex. Crim. App. 2007). Thus, we are bound to follow the precedent of the Court of Criminal Appeals. *See Ervin*, 331 S.W.3d at 54; *Kiffe v. State*, 361 S.W.3d 104, 109–10 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Temple v. State*, 342 S.W.3d 572, 583 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

We further note that we have previously reviewed and addressed the constitutional challenges made by appellant and rejected them. *See Mason v. State*, 416 S.W.3d 720, 728, n.10 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Mayer v. State*, 494 S.W.3d 844, 848 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Houston v. State*, No. 14-18-00726-CR, 2020 WL 1883421, at *2 (Tex. App.—Houston [14th Dist.] Apr. 16, 2020, pet. ref'd) (mem. op., not designated for publication); *Garcia v. State*, No. 14-19-00434-CR, 2021 WL 208191, at *1 (Tex. App.—Houston [14th Dist.] Jan. 21. 2021, pet. ref'd) (mem. op., not designated for publication); *see also Malbrough v. State*, 612 S.W.3d 537, 559–60 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

We overrule appellant's second and third issues.

## SUFFICIENCY OF THE EVIDENCE

In appellant's first issue, he argues there is legally and factually insufficient evidence to support his conviction for murder. Appellant argues that the State offered no evidence that appellant intended to cause Piper's death or serious bodily injury. He contends that the State had no evidence that appellant was the person who shot Piper and no evidence that any such act was intentional. Appellant argues that there is no evidence that he shot Piper because she rebuffed his sexual advances, as the State argued at trial. And finally, appellant argues that there is no evidence connecting his ownership of a gun to the gun used to kill Piper.

## A. General Legal Principles

In evaluating the sufficiency of the evidence, we must view all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Laster v. State*, 275 S.W.3d 512, 517

4

(Tex. Crim. App. 2009). This standard applies equally to circumstantial and direct evidence. *Laster*, 275 S.W.3d at 517–18. Because the factfinder views the evidence firsthand, the factfinder is in the best position to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 326; *Laster*, 275 S.W.3d at 517 ("[U]nlike the factfinder—who can observe facial expressions and hear voice inflections first-hand—an appellate court is limited to the cold record."). We presume the factfinder resolved any conflicts in favor of the verdict and must defer to that resolution as long as it is rational. *Jackson*, 443 U.S. at 326. The jury may use common sense and apply common knowledge, observation, and experience gained in normal affairs when drawing inferences from the evidence. *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had a reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 517.

A person commits the offense of murder if the person intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02 (b)(1)–(2). A person act intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id*. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b).

"The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Guevara v. State*, 152 S.W.3d 45, 49–50 (Tex. Crim. App. 2004).

A lack of direct evidence is not dispositive on the issue of guilt. *Id.* Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient. *Id*. The same standard of review is used for both circumstantial and direct evidence. *Id.* "Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). "Intent is most often proven through the circumstantial evidence surrounding the crime, and the jury may infer the requisite intent from the acts, words, and conduct of the accused, and the method of committing the crime and the nature of the wound inflicted on the victim." *Zuniga v. State*, 393 S.W.3d 404, 412 (Tex. App.—San Antonio 2013, pet. ref'd). Evidence of a brutal mechanism of death inflicted upon a defenseless victim may be probative on the issue of intent or knowledge. *Id*. at 413.

## B. Background

Early on the morning of September 21, 2019, a jogger found Piper's body on a trial near the Addicks Reservoir in Houston, Texas. She suffered a single gunshot wound to the head and was deceased for many hours before she was found. The night prior to her death, appellant admitted he had been with Piper at the reservoir. In text messages with a friend, appellant admitted to driving Piper to the reservoir and sitting in his car with her at the reservoir. In a phone conversation with Piper's mother, appellant said he dropped Piper off about a mile away from where Piper's body was found. In both conversations appellant indicated the two had argued and separated, Piper going off on her own. Appellant reportedly said that not long after Piper left him, he heard a woman scream and a gunshot. After leaving the area and going to work, appellant called 9-1-1 and told

6

the dispatcher that he had heard a woman scream and a gunshot and was concerned for his friend Piper.

A sergeant from the Houston Police Department testified that he was dispatched to a discharge of firearms call in the early morning hours of September 21, 2019, around 1:00 a.m. The sergeant went to the location provided by appellant in his 9-1-1 call—around the intersection of Brittmoore Road and Hammerly Road. Having found nothing unusual at this location and because appellant had also identified a "retention pond" in the call,[1] the sergeant drove to the nearest retention pond he knew of, one behind a gas station at the corner of the intersection he was dispatched to. After again finding nothing unusual, he requested that dispatch call appellant back for further information. After the call-back, dispatch informed the sergeant that there was no further information provided by appellant. The sergeant then went "back in service." The sergeant testified that this call was unusual because, while they receive numerous "discharge of firearms" calls, this one identified a possible victim. The sergeant testified that there was more detail in this call slip than normal for this type of call. The sergeant also listened to a portion of the 9-1-1 call and agreed that appellant identified a large area where the gunshot may have occurred, but clearly indicated Addicks Reservoir. The sergeant testified that he does not hear a 9-1-1 call when it is made but is sent to respond by the dispatcher.

A captain from the Houston Fire Department testified that he and his crew responded to a call about a body on a jogging trail along the Addicks Reservoir early in the morning of September 21, at approximately 7:00 a.m. After speaking with the individual who reported the body, the captain testified he walked on the jogging path and saw an obviously deceased individual. He testified she was

---

[1] In the 9-1-1 recording, Losoya does not mention a retention pond.

7

clearly deceased because of the pooling of blood, discoloration of the skin, and lividity of the body. He observed a wound on her head but was not sure if it was a gunshot wound based on his observation.

A detective with the Houston Police Department testified that he went to the scene, at the dead-end of Chatterton Drive, roughly the intersection of Chatterton Drive and Sherwood Forest Street. There were no items on the body that enabled the detective to identify the individual. The individual, Piper, was later identified by her fingerprints through the medical examiner's office. Piper suffered a single gunshot wound to the head. At the time of her death Piper had loose change and a lighter in her pocket. The detective observed a "spent bullet casing cartridge," a .45 caliber casing, about two to three feet away from the body. There were also multiple other "corroded" bullet casings on the trail, .22 caliber casings and a "WMA18"[2] casing. The .22 caliber casings had gravel inside of them and were located further away from the body on the same trail, near the trail entryway area. Exhibits twenty-three through twenty-six depict four .22 caliber casings. Exhibit nineteen depicts the distance of these casings from the body.

The detective testified that there were no indications of any struggle around or on Piper's body. There did not appear to be any bruises or injuries apart from the gunshot wound. He testified that some of the bruising on Piper's face would have been from impact with the ground after being shot. The swelling to Piper's face would have resulted from the bullet impact. The detective testified that there was no indication that the body had been shot somewhere else and moved to this location. Based on the pooling of blood and the lack of any drag marks on the ground, the detective believed that Piper had been shot in that location. The .45

---

[2] The detective testified that a "WMA18" casing is "more closely related to a .9 millimeter."

caliber bullet casing was located only two to three feet from Piper's body. The appearance of the casing was "clean, dark in color, empty within the cylinder itself." The detective testified that approximately eight to nine feet from the body was the WMA18 casing. The detective testified that a single weapon is not capable of firing both of the casings found near Piper's body. The WMA18 casing also had gravel on the inside of the casing and corrosion. The detective testified that unlike the other bullet casings found at the scene, the .45 caliber casing was the only "clean" casing that was found. No weapon was located at the scene during the investigation. Piper's cell phone was also not located at the scene.

A forensic investigator with the Houston Forensic Science Center testified that she documented and observed the area where Piper's body was found. From the footpath that led up to the trail going north, Piper's head was 648 feet away on the trail. She testified that the .22 caliber bullets casings and the WMA18 casing looked impacted by the elements, and she believed they had been there for some time. The forensic investigator testified that she took measurements and the WMA18 casing was eighteen feet north of Piper's head, while the .45 casing was only three feet east of Piper's head. She also testified that the .45 casing appeared to be "cleaner." She testified that the WMA18 casing had some "sand in the cracks and small gravel on the inside of the cartridge case" and "more closely resembling the .22 caliber than the .45." In the diagram admitted into evidence, the .22 caliber casings were closer to the footpath than to Piper's body. The photographs show that the .22 caliber casings were grouped together near the footpath.

Piper's boyfriend testified that Piper left their home in northeast Houston at around 10:00 p.m. on Friday, September 20. Piper told him that she was going with a friend named Monica to drop off some marijuana. Piper and the boyfriend

9

have two young daughters that lived with them at the time. The boyfriend testified he thought Piper's story was unusual, that she was lying, and that when she did not return home, he assumed she had runoff with another man. The boyfriend testified that Piper always had her phone with her but that she had left her wallet at home that evening.

The boyfriend's aunt testified that at the time of Piper's death Piper and the boyfriend lived with her at her home in northeast Houston. She remembered Piper leaving that night and testified that Piper's boyfriend did not leave the house at all that evening. She testified that she set the house alarm at about 1:30 a.m. and then went to bed. She testified that Piper's boyfriend was asleep in the living room at that time.

Another sergeant from the Houston Police Department testified. At the time of Piper's death, the sergeant was one of two detectives assigned to the investigation. The sergeant testified that on the evening that appellant was with Piper, appellant clocked in at his work at 11:43 p.m. The sergeant testified that the 9-1-1 call came in at 12:23 a.m., or forty-three minutes after appellant arrived at work. The sergeant admitted that he believed appellant was late for his shift and he had asked someone at the front desk whether appellant was late. However, he did not have a confirmation of who he talked to or a document showing appellant's work schedule.

An assistant medical examiner testified that Piper's cause of death was a gunshot wound to the head and the result of homicide. Piper's death likely would have been immediate and it is unlikely she was able to walk after being shot. The medical examiner was unable to pinpoint a time of death or say what type of gun was used to kill Piper but also could not rule out a .45 caliber weapon. The entrance wound was at the back of Piper's head and the bullet exited over Piper's

10

left eyebrow. The medical examiner testified that there was no stippling on the skin or soot near the gunshot wound. Typically such evidence is present when the gun is pressed to the skin or in very close range. However, the medical examiner also testified that Piper's hair could have blocked the stippling or soot from depositing on or near the entrance wound. Thus, the medical examiner could not rule out the shooter being in close proximity to Piper when firing, despite the absence of soot, because of Piper's hair and where the bullet struck.

A woman named Phyllis testified that on August 25, 2019, about a month before Piper was murdered, appellant acquired a .45 caliber handgun.

A friend of appellant's, Lucia, testified about the conversation that she and appellant had on the morning Piper's body was discovered. Around 7:30 a.m. on September 21, appellant texted Lucia to tell her he believed that there had been a murder at the Addicks Reservoir the night before. Three hours later Lucia responded that she already knew about the murder. Appellant clarified that he was not sure there was a murder and, "I know the victim." Lucia shared a news story with appellant confirming a murder at the reservoir, but not providing any identifying characteristics of the victim. Appellant told Lucia that the victim was his "crazy ex" that "stalked" him. Lucia asked how he found out about it. appellant responded:

> Last night I was giving her a ride home. She said she lived down [C]lay and [B]rittmore[.] We got out the car and she said she wanted to talk to me. She wanted a "hug", she tried to kiss me, I pushed her away and she got pissed and stormed off. I left to the car, I heard a gun shot on my way out. I don't know what happened exactly after that. She hasn't answered her phone.

Lucia asked where he left Piper and appellant responded, "I parked the car where we usually chill." Lucia testified that she had been to the Addicks Reservoir

11

several times and when she would go, she would enter the reservoir at Chatterton Road. Lucia testified that appellant "always" parks there, is familiar with the area, and could accurately describe it.

Lucia questioned why appellant would leave his friend alone at the reservoir and appellant responded that he "came back after I heard the gunshot . . . I didn't just leave her." Appellant told Lucia he was not able to find her, so he called the police. Lucia responded that she was sure that Piper made it home and she was probably just ignoring him. Lucia next asked whether he killed Piper. Appellant responded that he could not believe that Lucia would accuse him of killing his friend. Lucia responded that she thought appellant's story is "weird" and that she was going to go to the reservoir and see what she could find out. In the remaining messages the two discussed why appellant was with Piper and what they were doing:

> [Appellant:[3]] She was my friend
>
> [Lucia:] I thought she was a stalker
>
> [Appellant:] No matter how crazy she is good person
>
> [Appellant:] She is but people have good hearts Lucy
>
> [Appellant:] I know you see the good in people no matter how stupid they are
>
> [Lucia:] THATS WEIRD WHO HANGS OUT WITH THEIR STALKERS
>
> [Appellant:] Your the one who told me to be nice!
>
> [Appellant:] I was hanging out with her btw
>
> [Appellant:] She told me she was gonna help me go see my son. . .
>
> [Appellant:] Thats the only reason I picked her up to begin with.

---

[3] We recognize that missing punctuation and spelling errors exist within the messages and have chosen to leave the messages "as-is" without noting such errors and omissions for readability.

[Appellant:] I haven't seen him in over a month so yea I was kinda desperate

[Lucia:] So then why go there?

[Lucia:] And I thought you said that she was the one that needed to talk

[Appellant:] Bc we were on the back home coming from I.10, she kept saying that she was having second thoughts.

[Appellant:] She wanted to talk, I'm the one who mentioned [Addicks], she said she never been. I go all the time how the [f***] was I suppose some [s***] would happen !!

. . .

[Lucia:] So you were calling the cops while you were at work?

[Appellant:] If all your gonna do is continue to [f***in] question me, then forget it sorry I [f***in] bothered

[Lucia:] It just doesn't add up to me

[Lucia:] I just need to find out if it was a girl [emoji]

[Appellant:] Please!!

[Lucia:] Im going out there to ask

[Lucia:] Im not sure if they'll give me info

[Appellant:] Wait!

[Appellant:] It is a female

[Appellant:] Jessica found something.

[Lucia:] Okay and it was?

[Appellant:] [F***], look she said if you go up there asking questions they might thing you have some involvement

[Lucia:] No? I've done it before

[Appellant:] Ok, be careful

[Lucia:] I can say I live around the area and I'm concerned

[Appellant:] Don't ask to many questions, I don't want them getting the wrong idea

[Lucia:] I mean I could say how you had a friend that walked off on you last night?

13

[Lucia:] And you never found her

[Lucia:] And she won't answer your calls

[Appellant:] Wats goin on??

[Appellant:] Wyd right now

[Appellant:] Pick up

[Appellant:] Pick up please

[Appellant:] Come on Lucy please

[Appellant:] Damn it Lucy pick up

[Appellant:] Give me 5mins

[Lucia:] 5 mins for?

[Appellant:] Phone call

[Lucia:] ??

[Appellant:] Just pick up I'll explain

[Lucia:] Hold up

[Appellant:] Ok

[Lucia:] Okay

[Appellant:] Call me back

[Appellant:] I think I hit the power button

[Appellant:] Lucy?

[Appellant:] Can you talk??

[Appellant:] This really important Lucy

[Lucia:] I really can't talk

[Lucia:] Im with my brother we are going out of town in a bit

[Appellant:] Let me just say what I need to say then I'll leave alone

Lucia testified that when appellant called her that he sounded "frantic" and that was abnormal. She also testified that prior to the night Piper was murdered appellant had acquired a firearm, but she had never seen him with a firearm.

14

Another detective from the Houston Police Department testified regarding the cell phone data collected in this case. The detective testified that from the data he reviewed, both Piper and appellant's phones were in the same vicinity, near U.S. 59 and Hopper Road, around 9:46 p.m. on the night of the murder.[4] The phones moved south in the same general area as one another. Both phones traveled south and then west from 10:04 p.m. to 10:13 p.m. After traveling northwest on Highway 290, then southbound on Beltway 8, both phones were in close vicinity to the reservoir at around 10:43 p.m. At 11:21 p.m., appellant made two calls of short duration to each of his sisters. At 11:24 p.m., Piper's phone stopped communicating with cell phone towers. The detective testified that this could mean the cell phone was turned off, destroyed, dumped in a lake, or ran "out of service." The detective testified that after the two calls and after Piper's phone stopped communicating, appellant's phone was "bouncing off a different side of that tower" it had been communicating with and was instead communicating with a different side of the tower. The detective testified that this is indicative of appellant's phone leaving the area. From 11:26 p.m. until 11:40 p.m., appellant's phone traveled north. At 12:23 a.m. appellant called 9-1-1. At 12:38 a.m., appellant began making phone calls to Piper.

Kimberly Jones, Piper's mother, testified that on Saturday morning Piper's boyfriend called her to ask if Piper was with Kimberly. After talking with Piper's boyfriend, Kimberly went to pick up Piper's daughters. Kimberly then called area hospitals to try and find Piper. On Sunday she called the morgue and was informed that Piper was deceased. She called Piper's boyfriend and told him that Piper was dead. Kimberly testified that Piper's boyfriend was in shock at the news. That same day, Kimberly received Facebook messages from someone

---

[4] Prior testimony established that Piper left her home around this time.

15

named "Sam Adams." After sending some messages, Sam Adams identified himself as appellant. Appellant sent his phone number to Kimberly and talked with her on the phone. He asked her whether Piper was alright because he was with her on Friday night. Kimberly asked appellant where Piper was, and appellant responded that he had dropped her off at the Exxon gas station at Brittmoore Road and Clay Road. After having her memory refreshed from her statement to police in 2019, Kimberly admitted she did not mention any Exxon gas station to the police in her statement. She only mentioned the neighborhood and a park around Brittmoore Road and Clay Road. Kimberly testified that she had never lived in that area and that Piper did not live in that area.

## C.    Analysis

Appellant argues that the evidence is legally and factually insufficient because the State did not provide any evidence that appellant intentionally or knowingly caused Piper's death or intentionally or knowingly caused Piper serious bodily injury. Appellant contends that there is no evidence that appellant was the person who shot Piper and even if there was some evidence that would "support an inference" that he was the shooter, there is no evidence that would give rise to a reasonable inference that he intentionally or knowingly committed the offense. Appellant argues alternatively that if there is evidence, it is only a mere modicum.

Considering all of the evidence in the light most favorable to the verdict, we conclude the jury could reasonably infer that appellant intentionally murdered Piper. The evidence showed that appellant was the last person to see Piper just prior to her murder. Appellant had taken her to the reservoir—an area he knew well because he had been there often. Appellant left the reservoir just after Piper's phone stopped communicating with cell towers. Appellant went to work and clocked-in at 11:43 p.m. Appellant waited approximately forty minutes after

16

clocking-in, and almost an hour after he left the reservoir, before calling 9-1-1. Appellant could not tell the 9-1-1 dispatcher where precisely he and Piper were despite having been there numerous times. In the 9-1-1 recording, appellant stated he was "freaking out a bit" and his heart was "racing" even after being removed from the scene for at least an hour and having never attempted to call Piper since leaving the reservoir. Appellant had a .45 caliber firearm that he acquired about a month prior to Piper's murder. The officers opined that the .45 caliber shell casing was more recent than all of the bullet casings found at the scene. The .45 caliber casing was also the closest to Piper's body, only three feet away. Piper was shot in the back of the head and her death was immediate. Piper's phone was missing and never recovered.

Appellant's behavior after leaving Piper at the reservoir and the conversations he had with the 9-1-1 dispatcher, Lucia, and Piper's mother highlighted the inconsistencies between his versions of events. In the 9-1-1 call appellant indicated he was walking away from Piper and "tried going back to see what was wrong with her, and I had seen some people walking in . . . and I heard a scream and I heard a single gunshot. I turned and I ran. I went to the car and I left. I tried to come back and I . . . didn't know what to do." In text messages with Lucia, he said Piper "stormed off" and he went to the car and "heard a gunshot on my way out." Appellant never mentioned seeing anyone else on the trail. When Lucia questioned why he would just leave Piper, appellant said he came back after he heard the gunshot and he didn't just "leave her." Appellant then told Lucia he could not find Piper and that he called the cops. In his conversation with Piper's mother, appellant stated he dropped Piper off at a gas station or a park approximately a mile away from where Piper was discovered. Appellant told Kimberly that when Piper stormed off, he sat in his car for five minutes and went

17

to try and find her, again making no mention of seeing anyone else in the vicinity. That is when he heard a woman scream and a gunshot.

The evidence conclusively established that Piper was shot in the back of the head with a firearm. She did not defend herself in any way. The bullet entered the back of Piper's skull, traveled through her head, and exited above her left eyebrow. Her death was immediate. In the light most favorable to the verdict, the evidence showed that Piper was shot with a .45 caliber bullet from close range. Appellant acquired a .45 caliber firearm about a month prior to Piper's murder. The gunshot wound Piper suffered, along with the other circumstantial evidence enumerated above, is sufficient to show that appellant intentionally or knowingly caused Piper's death with a firearm. *See Gardner v. State*, 306 S.W.3d 274, 285–86 (Tex. Crim. App. 2009) (rejecting argument that evidence was insufficient to prove beyond a reasonable doubt that the defendant was the shooter because no eyewitness could affirmatively put the defendant at the scene); *Watkins v. State*, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd) ("Where a deadly weapon is fired at close range and death results, the law presumes an intent to kill."); *see also Finley v. State*, 529 S.W.3d 198, 203 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (concluding circumstantial evidence sufficient to uphold conviction despite absence of eyewitness testimony that the defendant committed the murder).

Appellant argues that it is not reasonable for the jury to infer that the inverse of appellant's story was true—that he had a motive to kill Piper because he tried to make a sexual advance and Piper spurned him and appellant became angry. However, motive is not an element of murder, but a circumstance of guilt. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). The State may, but is not required to, offer evidence of motive. *Id.* at 267. However, in his own words

during his call with the 9-1-1 dispatcher, appellant "got mad" at Piper and later stated, "I'm not going to lie, I was really mad at her" when he allegedly left her at the reservoir.

Appellant contends that because there are so many .45 caliber weapons in Texas, the fact that there was evidence that the .45 caliber bullet was believed to be newer and, thus, likely the bullet caliber that killed Piper, is insufficient to establish that appellant killed Piper. We disagree. The State presented evidence that the .45 caliber casing was newer than the other casings and was the closest to Piper's body. This supports a reasonable inference that the .22 caliber casings all grouped in close proximity to one another and a much further distance away from Piper's body were unrelated to Piper's murder. This leaves only the .45 caliber casing and the WMA18 casing. The .45 caliber was closer to Piper's body, had no weathering, and had no gravel on the inside of the casing. The WMA18 casing was farther away from Piper's body, was weathered, and had gravel on the inside of the casing. Particularly considering that this area had significant rainfall and flooding in the day prior to the murder,[5] the jury could reasonably infer the .45 caliber was more recent and was the casing that housed the bullet that killed Piper. One witness testified that appellant had acquired a .45 caliber firearm a month before Piper's murder. Lucia testified appellant acquired a firearm prior to Piper's murder. Appellant admitted to being at the scene and hearing a single gunshot. His story about the events of that night changed, he was "freaking out a bit" and his heart was "racing" despite waiting over an hour to call 9-1-1, he did not attempt to call Piper until after he called 9-1-1 and over an hour after he left her at the reservoir, and he was described as "frantic" when he thought Lucia would go to the scene and ask questions.

---

[5] The fact that Tropical Storm Imelda had come through Houston on Thursday, September 19, 2019 was referenced throughout the trial.

19

Lastly, appellant contends that the "other evidence conclusively established a reasonable doubt" but does not detail the evidence to which he is referring. We have reviewed all the evidence in the light most favorable to the prosecution and concluded that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517.

We overrule appellant's first issue.

### CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the judgment of the trial court.

/s/    Ken Wise
         Justice

Panel consists of Justices Wise, Zimmerer, and Poissant.

Do Not Publish — TEX. R. APP. P. 47.2(b).