# NO. 12-12-00379-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *SHELLEY WALKER,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 241ST* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | *§* | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Shelley Walker appeals her conviction for injury to a child. She raises three issues on appeal. We affirm.

### BACKGROUND

Appellant and her husband, Kenneth Neal Walker, are the biological grandparents of B.W., N.W., and T.W., whom they adopted in December 2010. B.W. is the youngest of the three children. On February 28, 2012, she sustained second degree burns to the top and bottom of her feet that required medical treatment and hospitalization. Thereafter, a Smith County grand jury indicted the Walkers for the offense of injury to a child.

The Walkers pleaded not guilty to the charge, and a joint jury trial was held. The jury found them both guilty of the offense, made an affirmative deadly weapon finding, and assessed punishment at twenty-five years of imprisonment. This appeal followed.[1]

---

[1] Appellant requested that counsel be appointed to represent her on appeal because she was indigent. The trial court appointed the same attorney to represent Appellant and Kenneth in each appeal. Appellate counsel explained in court that he was not aware of any conflict of interest in representing both of the Walkers. The trial court judge then asked Appellant whether she was "agreeable" to having the same appellate counsel represent her that will also be representing her husband on appeal and whether she waived any conflict of interest arising from the appointment. Appellant responded, "Yes, sir."

Appellant's first two issues challenge the sufficiency of the evidence. In her first issue, Appellant contends that the evidence is legally insufficient to support the verdict. In her second issue, she contends that the evidence is insufficient "to support the jury verdict that this was serious bodily injury."

**Standard of Review**

When sufficiency of the evidence is challenged on appeal, we view all the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The reviewing court defers to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight of their testimony. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Brooks*, 323 S.W.3d at 899. A jury is permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.*

A "presumption" is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. *Id.* at 16. An "inference" is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* "Speculation" is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.*

Inference stacking is impermissible; thus, when we apply the *Jackson v. Virginia* standard of review, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)); *Hooper*, 214 S.W.3d at 16-17. When the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *Garcia*, 367 S.W.3d at 687 (citing *Jackson*, 443 U.S. at 326; 99 S. Ct. at 2793).

The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

As set forth by the indictment in this case, the State was required to prove beyond a reasonable doubt that on or about February 28, 2012, in Smith County, Texas, Appellant intentionally or knowingly caused serious bodily injury to [B.W.], a child 14 years of age or younger, by holding [B.W.] in hot liquid thereby causing burns to [B.W.'s] feet and legs." *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2014).

## INTENT TO COMMIT INJURY TO A CHILD

In her first issue, Appellant argues that the controverted testimony presented at trial makes the evidence legally insufficient to establish each element of the offense, specifically, the intent to commit injury to a child. The State contends that the cumulative force of the incriminating circumstances is sufficient to prove that Appellant intentionally or knowingly caused injury to B.W.

### Applicable Law

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct, but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). Thus, the question is not whether Appellant's conduct was intentional or knowing, but whether the result of that conduct, B.W.'s injury, was intentional or knowing. *See Williams*, 235 S.W.3d at 750; *Zuniga v. State*, 393 S.W.3d 404, 412 (Tex. App.—San Antonio 2012, pet. ref'd). Under the penal code,

> (a)     A person acts intentionally, or with intent, with respect to the nature of [her] conduct or to a result of [her] conduct when it is [her] conscious objective or desire to engage in the conduct or cause the result.
>
> (b)     A person acts knowingly, or with knowledge, with respect to the nature of [her] conduct or to circumstances surrounding [her] conduct when [s]he is aware of the nature of [her] conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of [her] conduct when [s]he is aware that [her] conduct is reasonably certain to cause the result.

3

TEX. PENAL CODE ANN. § 6.03(a), (b) (West 2011).

Knowledge and intent may be inferred from the acts, words, and conduct of the accused. *Kelley v. State*, 968 S.W.2d 395, 399 (Tex. App.—Tyler 1998, no pet.); *Martinez v. State*, 844 S.W.2d 279, 283 (Tex. App.—San Antonio 1992, writ ref'd); *see also Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) (en banc) ("[M]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs.").

**The Evidence**

At the time of the alleged offense, the Walkers were raising three children:  B.W., age two, N.W., age three, and T.W., age six.  While B.W. was in the home with the Walkers and N.W., she sustained second degree burns to the top and bottom of her feet.

At trial, the State elicited testimony from medical professionals, law enforcement, social workers, and the Walkers' daughter-in-law, Amanda.  The State's theory was that one of the Walkers "dipped" B.W. in scalding water in Appellant's bathtub and kept B.W.'s feet from contacting the bottom of the bathtub's surface.  The State maintained that the one who did not perform the physical act of dipping B.W. into the water was a party to the offense.  The Walkers contended that the manner in which B.W. sustained her injuries was an accident and unknown because they were in another room when she was burned.

*The Children's History*

The Walkers adopted B.W. and her two older brothers in December 2010.  Prior to their adoption, Sammie Bedford conducted a social study of the Walkers.  In her social study, Bedford described the three children as "active" and said they "really were a handful."  She noted concerns that Appellant appeared to be "overwhelmed" trying to take care of the three children. When she conducted the study, Kenneth was working nights, slept during the day, and was unable to assist Appellant with the children.  Bedford recommended that the children be placed in a mother's day out program or other educational program for stimulation.  She testified that she had made the notations that Appellant was overwhelmed and the recommendation for the children to receive outside stimulation as "[k]ind of, to me, just a warning that they were good people.  They could probably care for the children, but they did need some assistance."

Bedford testified that she spoke with both of the Walkers individually about how they discipline the children.  Appellant told her that she would usually send the children to their room

and was also trying to use "timeout." Kenneth "made the comment that he had told [Appellant] she just needed to go outside and get a little switch and use it on the children." Bedford testified that after Kenneth made that statement, Appellant "stated she could not do that and told [Kenneth] that children placed by CPS are not to be physically disciplined." Bedford then explained to Kenneth the logic and reasoning behind CPS's rule against physical discipline, and he told her that he would abide by the rules. She also testified that both of the Walkers "said they would not physically discipline the children."

Bedford testified that "I know when people get overwhelmed and stressed to the [breaking] point, they sometimes will do things that they normally wouldn't do." Nevertheless, she recommended in her study that the children remain with the Walkers. Bedford testified that she did not think Appellant would physically discipline the children and confirmed that when she was called about this case, she was "totally shocked."

Amanda, the Walkers' daughter-in-law, had been living with the Walkers for a period of time prior to B.W.'s injury. She confirmed that the children had not ever been punished by any "unusual" method and testified that the Walkers "didn't even yell at the children." Amanda confirmed that the Walkers would spank the children, but described the spankings as "a love tap," and further stated that when the children were disciplined, "they thought it was funny and [would] laugh at us."

Amanda testified that B.W. and N.W. had a history of playing in the bathroom. On more than one occasion, B.W. and N.W. had locked themselves in the bathroom and overflowed the sink, toilet, and bathtub. Amanda explained that B.W. and N.W. would climb into the bathtub fully clothed or on top of the bathroom sink and turn on the water. There was one time in which the children had squeezed an entire tube of toothpaste onto the bathroom counter and another time in which they had emptied all of the bottles of soap into the bathtub. Amanda testified that they had installed locks on the bathroom doors in an effort to keep B.W. and N.W. from entering the bathrooms without adult supervision. She explained that they had put a lock on Appellant's bedroom door and a chain lock outside the bathroom door "recently before this happened, because we knew something was going to happen to it."[2] Amanda testified that approximately

---

[2] It is unclear whether the chain lock was installed on the outside of the hallway bathroom door only, or if a chain lock was installed on the outside of Appellant's bathroom door as well.

one week before B.W. was burned, the children (B.W. and N.W.) had overflowed Appellant's bathtub so that water flowed out from under the bathroom door.

*Appellant's Bathroom*

Appellant's bathroom was connected to her bedroom, which was located at the back of the duplex.[3]  The bathtub was standard size and sloped from back to front, with the front of the bathtub being approximately "an inch and a half" deeper (where the spout is located) than the back.  It had sliding glass doors with a metal railing, and the opening measured twenty-two inches wide.

Officer John Weaver photographed the bathtub shortly after B.W. was transported to the hospital by ambulance.  Officer Weaver testified that Kenneth used a kitchen knife to pry open Appellant's bedroom door in order for them to access the bathroom.  He described the bedroom as "very hot and humid" and the bathroom as "very hot."  A photograph of Appellant's bathtub showed that it was almost full of water, with the faucet still running, and several bottles of soap floating inside.  The photograph and testimony at trial also showed that the glass doors were off the track.  Several witnesses at trial confirmed that the photograph appeared to illustrate a scene in which children were playing in the bathtub.

*Water Temperature and Scalding*

Investigator Jeffrey Scott Rackliff with the Tyler Police Department took measurements of the water temperature flowing out of the water faucets in the Walkers' home.  He took readings of the water temperature at the water heater's temperature setting when they arrived at the Walkers' home and then took measurements after adjusting the water heater to its highest temperature setting.  Rackliff testified that after being adjusted to the hottest setting, water flowing out of Appellant's bathtub faucet measured 131 degrees Fahrenheit.[4]  He explained that he then allowed the water to pool inside the tub to a depth of four to six inches (after the water reached its maximum temperature), and that at this depth, the water measured approximately 128 to 129 degrees Fahrenheit.

---

[3] The Walkers lived in a three bedroom, two bathroom duplex.  One bathroom was located in the hallway, and the other was connected to Appellant's bedroom, which was located at the back of the home.  It was in Appellant's bathroom that B.W. sustained her injuries.

[4] All references to temperature are to the Fahrenheit scale unless otherwise noted.

Two of the State's medical experts testified about the temperature necessary for water to cause a scald burn. Dr. Steven Wolf, a burn surgeon at Parkland Hospital, testified that a child who was dipped in 131 degree water could sustain injuries similar to B.W.'s after being submerged for ten to fifteen seconds. However, Dr. Wolf explained that children can also sustain second degree burns in water measuring 124 degrees in less than one to two minutes. Dr. Matthew Cox, a pediatrician and medical director for a program that evaluates children in cases concerning physical abuse or neglect, testified that he believed the water that burned B.W. was "well over 130 degrees." He also stated that the temperature of the water "does not change the fact that [B.W.] has burns."

### B.W.'s Burns and Other Injuries

Most of the testimony relating to B.W.'s burns and other injuries came from three expert witnesses—Dr. Wolf, Dr. Cox, and Dr. Kevin Scott Lawrence.[5] The evidence showed that the burns to B.W.'s feet were consistent with a scald burn associated with "pooled" water rather than "running" water. Dr. Wolf first saw B.W. on February 29, 2012, and testified that she underwent surgery for removal of dead skin from her feet. The evidence showed that B.W. had burns to the bottom of her feet. According to Dr. Wolf, these burns did not appear to be as deep, "simply because the skin is thicker, but you can see there's still some blistering." Upon being shown a photograph of B.W.'s feet, Dr. Wolf confirmed that the burn on B.W.'s left foot "appears that it might be somewhat higher on the left than the right." But he also confirmed that there was a "clear demarcation at the ankle level" between the injured and the uninjured area.

Dr. Cox described the burns to B.W.'s feet as "very symmetric," "uniformly burned," and containing a "distinct line[, a water line,] between the burned and the unburned skin."[6]

When Dr. Lawrence described B.W.'s burns, he testified, as did Dr. Wolf, that the burns on B.W.'s right side were lower than the burns to her left side.

---

[5] The State elicited testimony from Dr. Bradley King, the emergency room physician at East Texas Medical Center who treated B.W.'s burns prior to her transfer to Parkland Hospital. Dr. King's testimony relating to B.W.'s burns was limited in comparison to that elicited from Doctors Wolf, Cox, and Lawrence.

[6] Several photographs of B.W.'s injuries were admitted into evidence. As a general matter, B.W.'s burns appear to have the "water line" Dr. Cox describes in his testimony. But the depictions of B.W.'s injuries in State's exhibits 13 and 14 and Defendant's exhibits 8, 11, and 12 appear to show the slight "wave" the defense discussed in its cross examination of Officer Weaver, which is referred to later in this opinion.

Dr. Wolf testified that B.W. did not appear to have any other injuries and that there were no signs of struggle or signs of B.W.'s trying to get out of the bathtub. But after he was presented photographs of scrapes on B.W.'s chest and thigh on cross examination, he agreed that the scrapes could have occurred the same day that B.W. was burned. Dr. Cox, Dr. Lawrence, and Detective Michelle Brock, the lead investigator for the case, also confirmed that B.W. had several scrapes and bruises on her body.[7] Two photographs were introduced at trial that showed a large scratch on B.W.'s chest and left leg. Dr. Cox agreed that the scratches appeared recent and could "possibly" have occurred the morning B.W. was burned.

*Alleged Indicators of Abuse*

Detective Brock testified that she did not believe B.W. was capable of turning on the water faucet or climbing into Appellant's bathtub by herself. However, testimony from Dr. Cox showed that, based on B.W.'s age, history, and other abilities, she was capable of getting in and out of a standard sized bathtub. To support this contention, Dr. Cox explained that while B.W. was hospitalized, she climbed out of her hospital crib, which had railings that were approximately "a couple of feet above the patient mattress level." Medical staff found her on the floor in her room.

#### i.    Lack of Splash Marks

Dr. Wolf testified that in cases involving scald burns, the water must be hotter than 130 degrees to sustain "splash marks." B.W. did not sustain any splash marks to her body. Officer Weaver, Detective Brock, Dr. Cox, and trauma nurse clinician Corey Manges each testified that the lack of splash marks on B.W.'s body was an indicator of abuse because it showed that B.W. was not kicking her legs while she was in the water. Thus, her injuries were due to forced submersion. But Dr. Wolf testified that the lack of splash marks was not indicative of abuse in this case because the water temperature was not hot enough to create splash marks.[8] He further explained that if the water was 129 degrees, there would be no identifiable injury because the water would not be in contact with the skin long enough to cause the splash marks. He testified further that a lack of splash marks "shouldn't be an issue" in this case.

---

[7] Dr. Cox testified that there were no hand marks, hand prints, or any specific grasp marks on B.W.

[8] Dr. Wolf explained, "See, what I'm getting at is that the lack of splash marks means it could be either forced or non-forced [sub]mersion."

Dr. Cox testified that he considered the lack of splash marks an indicator of forced submersion because children who are accidentally burned commonly have splash marks. On cross examination, he testified that he was "not aware of any scientific studies" that have shown that water must be at least 130 degrees in order to create splash marks as Dr. Wolf had earlier testified. Dr. Cox was then presented with an article contained in the Journal of Pediatrics discussing accidental scald burns and read the following:

> [A]t temperatures below 130 degrees Fahrenheit, splash marks do not occur because burning is not instantaneous at that temperature.
>
> In lower water temperatures, the absence of splash marks does not support accidental or inflicted injuries.

### ii. Lack of Sparing

In cases involving scald burns to the feet, "sparing" occurs when there is less burning to the bottom of the foot than the top because the bottom of the foot is in contact with the bathtub surface, which insulates that portion of the foot from getting burned. The evidence showed a lack of sparing to B.W.'s feet. Dr. Wolf testified that the existence of sparing is typically a sign of abuse and forced submersion, but explained that a lack of sparing (as in this case) did not rule out abuse.[9] Dr. Cox testified that the lack of sparing to B.W.'s feet shows that her feet were not in constant contact with the bathtub surface.

Dr. Cox and Dr. Wolf both testified that the presence of burns to the bottoms of both of B.W.'s feet weighed against the contention that B.W. was accidentally in the bathtub.[10] Nevertheless, Dr. Wolf testified that the burns to B.W.'s feet were consistent with walking around in the bathtub, but stated that he would be "very surprised" to have a child stay in the

---

[9] Dr. Wolf testified that the fact that B.W.'s feet were burned on the bottom means, "It's unlikely she was forced or held to the bottom of the tub. It doesn't mean that she wasn't put into the tub."

[10] Dr. Cox testified that if a child was accidentally in the water,

> you would see asymmetry, because even if you couldn't get both legs up, you would lift one up and stand like a bird, a flamingo or something, you've got one leg out so it didn't hurt both feet. . . . And also that water line would not be as regular. When we see kids who accidentally fall into things and stuff that's really irregular because it's only the part that touched that water that's involved. And a normal child moving around is going to keep as much of their skin out of that as possible.

water long enough to sustain the kind of burns that B.W. suffered. Dr. Wolf was asked, "Now, because her feet are burned on the bottom, obviously, that means she was probably moving around in the bathtub; isn't that true?" He responded, "That is true."

Dr. Cox agreed that a child would sustain burns to the bottom of her feet if she was walking in a bathtub of scalding water. He maintained, however, that B.W.'s pattern of burns was consistent with forced submersion because the water line indicates that the child was held still rather than moving around trying to get out of scalding hot water.[11] Dr. Cox also testified that if a child was walking around in the water by herself, there would be asymmetry in the burns "because you would lift one leg up so it won't hurt both feet." He further explained that

> I think most kids in a bathtub would do what they could to climb out of the bathtub. At that age she could easily climb in and out of a bathtub, so normally [she] would lay across the ledge and lift their legs out.
>
> So that would probably be the most likely explanation, diving out, tumbling out, whatever, getting their feet out of the water that's scalding hot.

### iii. Cause of Scrapes and Bruises

Dr. Cox and Detective Brock testified that the existence of scrapes and bruises on B.W.'s body was concerning because their cause was not clearly explained. According to Dr. Cox, some of B.W.'s scrapes and bruises were not from "roughhousing kids." But B.W.'s skeletal survey did not raise any concerns about B.W.'s being abused or intentionally burned.

Dr. Wolf, Dr. Cox, Detective Brock, and Dr. Lawrence all agreed that the metal tracks for the sliding shower doors were capable of causing scratches, and the evidence showed that the doors were not properly on their tracks when law enforcement arrived after Kenneth called 911. On cross examination, Dr. Cox was presented with a hypothetical about a child being blocked from exiting the tub, and he testified that he did not believe that being blocked in for five to ten seconds was very "realistic." He explained, "I think it would be a second for that kid who was in that much pain to dive out, knock the other kid over, or do whatever they can to get out. So, it would be a quick thing because it hurts that bad."

---

[11] Dr. Wolf also testified that if B.W. was walking through water, "there would not be a clear demarcation," especially if water was filling the bathtub.

*The Walkers' Physical Attributes*

B.W. weighed approximately twenty-eight pounds on the day she sustained the injuries to her feet. Appellant was almost sixty and Kenneth was fifty-four years old. Testimony relating to Kenneth's medical records showed that he has suffered one heart attack, one stroke, and has a pacemaker. He has carpal tunnel syndrome, has had three surgeries for "the same problem in his wrist," and had shoulder surgery within one year prior to B.W.'s injury. The evidence also showed that Kenneth suffered from back problems that required him to receive "facet injections," and was no longer working because he was on disability.

Appellant's medical records showed that she was five feet tall, weighed 136 pounds, and suffered from "essential hypertension, compression arthralgia of ankle/foot, chronic major depression, and chronic pain syndrome." The medial records also showed that Appellant's plan of treatment was to administer medication for the depression, pain, and hypertension, but recommended a referral for the "compression arthralgia." Photographs were later admitted that showed the "hypertrophy and arthritis" in Appellant's feet.

At trial, Dr. Wolf was advised of the Walkers' health conditions and testified that Kenneth would "have to really try with those medical conditions." He stated that it would also be difficult for Appellant to accomplish a forced submersion of B.W. in the bathtub. Dr. Cox confirmed that he did not consider the capabilities of the adults alleged to have caused B.W.'s injuries when he made his assessment, and agreed that B.W. was "a lot of weight to hold." Nevertheless, Dr. Cox testified that "you can do it as a single person holding a child in water; not the easiest thing, but definitely could be done by a single person."

Detective Brock testified that she did not think it was relevant to factor the Walkers' physical attributes into whether they were capable of holding B.W. in a position required to sustain the injuries B.W. suffered. She stated, "[T]hey're mobile. They're able to walk around."

*The Walkers' Rendition of Events*

Detective Brock testified that the Walkers gave several inconsistent stories, which was relevant in establishing their guilt because it showed "they're covering up what really happened by trying to put a different story out there. Then they can't remember the story, so they have to give another story."

### i. Explanation to Amanda

The evidence showed that on the morning B.W. was hurt, Appellant called her daughter-in-law, Amanda, seeking advice on how to treat B.W.'s burns. Amanda testified that Appellant first told her the children had locked themselves in the bathroom while she was folding clothes and that B.W. had burned her feet. It was not until later that Appellant told Amanda that she had made up the story about folding clothes to protect N.W. so she could account for his whereabouts at the time B.W. was injured. Amanda explained that Appellant was concerned about accounting for N.W.'s whereabouts because he had been recently diagnosed with autism and had a history of "hitting, biting, kicking, throwing, [and] punching." Amanda testified that the Walkers "didn't want it to look like, oh well, [N.W.] was in there with her, so he could have done it, or he could have coerced her into it, because he could have been right in that bathtub with her."

Amanda testified that when she arrived at the Walkers' home, Kenneth told her that he heard the children crying, B.W. had walked out of Appellant's bedroom, and Appellant picked up B.W. She testified that Kenneth told her later that day that he thought Appellant was giving medication to N.W. when B.W. was burned.

### ii. Explanation to Medical Professionals

Paramedic Gayle Holt testified that when they arrived at the Walkers' home, Appellant told her that "the little girl had burned her feet in the tub[;] that she had crawled in the tub and turned on the hot water, and that's how she got burned." Robin Davis, an emergency room supervisor, testified that Appellant said "she found the child in the bathtub, that she had gotten out and the child must have gotten in."[12] Corey Manges, a trauma nurse clinician at Parkland Hospital, testified that Appellant told her B.W. "got out of her sight and then ran and turned on hot water." Dr. Wolf testified that the medical records stated that Appellant

> thought the patient was in the living room watching TV and went out to go tend to another child screaming. Per the grandmother, her husband went into the bathroom after the patient locked herself in the bathroom and found her in the tub, which the patient filled with hot water herself.

Dr. Cox interviewed the Walkers together and testified that he believed Kenneth found B.W. first because Appellant "explained that she was at home but didn't know exactly what had

---

[12] Davis testified that Appellant had told her she "had tried to scrub" B.W.'s feet, but they did not get any better. Dr. Wolf testified that it did not appear that B.W.'s burns had been scraped, and explained that it would not have affected their treatment of B.W.'s burns.

12

happened because she wasn't—she didn't find [B.W.] first. She found out about the burns from her husband." Kenneth reported that

> he had been on the couch watching TV, grandmother was off doing some chores, and the kids were watching TV in the bedroom and that he heard [B.W.] screaming, and when he went to find her, he saw her walking out of the bathroom and she had blisters on her feet, and then he checked and saw that there was some water in the tub. So he saw her coming out of the bathroom was the history.

### iii. Explanation to Social Worker and CPS

Kay Garten, a social worker for Parkland Hospital, interviewed Appellant, who told her that "accidents happen all the time with kids." Appellant explained that

> [B.W.] was in the bathroom with grandfather and grandfather left the room to see about [B.W.]'s four-year-old brother[, N.W.], who has pervasive developmental disorder. She stated, when grandfather returned to the bathroom, [B.W.] had locked the door from the inside.

Patrick Dullard, an investigator for the Department of Family and Protective Services (the Department or CPS), briefly spoke to Appellant while she and B.W. were being transported to Parkland Hospital. He testified that she told him "[B.W.] was in the bathroom and got into the bathtub." Upon arriving at Parkland, Dullard interviewed the Walkers together and was told that they were in the living room, B.W. and N.W. were in the boys' room watching television, and shortly thereafter, N.W. came into the living room and they heard B.W. crying. When they heard B.W. crying, Kenneth went to check on her and B.W. was walking out of the bedroom and both of her feet were burned.

At trial, Dullard confirmed that he had spoken with Amanda about the events leading up to B.W.'s injury, and she reported that Appellant

> told her that while she was folding clothes in her bedroom that [B.W.] and [N.W.] went into the bathroom and locked the door. . . . [S]he heard the water running and then she heard [B.W.] scream. . . . [Appellant] had attempted to open the locked door herself, wasn't able to, so she called Kenneth Walker down at that time and he was able to open the door, and then they found the children in the bathtub at that time and [B.W.] had burned her feet.

Dullard testified that the biggest variation between the Walkers' and Amanda's explanation was N.W.'s location when B.W. sustained her injury.

iv. Explanation to Law Enforcement

The evidence showed that Kenneth called 911 at 8:54 A.M. reporting "I got a two-year-old girl that just scalded her feet in the bathtub . . . they, her and her little brother got in the bathtub and they turned the hot water on while she was in there and it scalded her feet." The ambulance and Officer Weaver arrived at the Walkers' home approximately five minutes later. Officer Weaver described Kenneth's demeanor as "uncertain" and told him that B.W.'s feet "got burned," but was not specific in describing what happened.

Tyler Police Officer James Lenderman arrived at the Walkers' home as B.W. was being placed in the ambulance. He testified that Kenneth told him that

> he had been in the living room with [N.W.], the other child, and Mrs. Walker was in the kitchen getting some medication ready for [N.W.] and that the baby had gone into the bathroom and apparently locked the door. And they wasn't sure how she had gotten into the bathtub and into the hot water.

Lenderman explained that at the time, "there was no indication that it was anything more than an accident." Kenneth had told him that the "bathroom door was locked; they didn't know there was a problem until [B.W.] started crying." In his report, Lenderman wrote that "it appears this was just a case of not enough supervision."

Four recorded interviews were introduced at trial—two interviews of Appellant and two interviews of Kenneth. Detective Brock confirmed that an investigative technique in interviewing is to get people "flustered" and agreed that sometimes when people get flustered, they sometimes say things they normally would not say. She confirmed that she was successful in her attempts to "fluster" the Walkers, but neither one implicated the other. Brock testified that Appellant was "putting on a show" during her interviews and confirmed that she called Appellant "a disgrace to motherhood," "a disgrace to grandmothers," and a "liar" during the interviews as part of her "investigative technique." Brock confirmed that during Kenneth's interview, she had "jumped on" and "berated" him and insinuated that he was "lying," even after he had correctly answered her questions. Brock testified, "He understood what I meant, and I should have rephrased it at the time."

a. Appellant's Recorded Interviews

In her first interview, Appellant denied harming B.W., cried and repeatedly stated that she loved her grandchildren. She maintained that she did not see B.W. until B.W. came out of

14

the bathroom and down the hall. She explained that she was in the living room getting N.W. a drink when Kenneth heard B.W. crying and got up from the couch to check on B.W. She said that she got up and saw B.W. coming around the corner. She then noticed that B.W.'s feet were red with "the skin of it raised up." Appellant asked, "Where has she been!?" and Kenneth told her that B.W. had come out of her bedroom. Appellant said that she ran into her bathroom, saw water in the bathtub, ran back to B.W., and told Kenneth to call 911.

Detective Brock confronted Appellant about her statement to Robin Davis that B.W. must have gotten burned from getting into the bathtub after she had taken a bath. Appellant appeared shocked at the comment, said there must have been a misunderstanding, and explained that she takes her baths at night.

Appellant told Detective Brock that N.W. had behavioral problems and had been violent towards B.W. and himself. She explained that the children were always going into the bathroom and that N.W. had been prescribed medication for behavioral issues the week before. She then told Detective Brock that the only detail she left out regarding what had happened was that "N.W. was in there and turned the water on," because she was afraid of N.W. being taken away from her. She said that Kenneth was ahead of her when they heard B.W. screaming. She estimated that Kenneth had been gone for about two to three minutes when B.W. came out with Kenneth behind her, crying, with burned feet.

During her second interview, Appellant admitted that she had lied in her previous interview. She explained that it was in regard to N.W.'s whereabouts because she was afraid that N.W. would be taken away if they found out he was in the bathroom with B.W. when she was burned. Appellant continued to tell Detective Brock that she did not see B.W.'s feet until she came around the corner. Detective Brock asked Appellant, "What would you do if she told us that Kenneth did it to her?" Appellant responded, "If she told you that Kenneth did it, I would believe her. I mean, she's two years old, she doesn't usually lie about stuff. But it's hard for me to believe he could do anything like that."[13] Appellant explained that it was not surprising that the children were in the bathroom on the morning that B.W. was burned because they like to play in the bathtub. Detective Brock asked Appellant why she told Amanda that she had been folding

---

[13] No evidence was ever offered or admitted at trial that B.W. had told anyone that either Kenneth or Appellant burned her feet.

clothes when the children were in the bathroom, and Appellant responded that she had been folding clothes earlier that morning, not when B.W. was burned.

Appellant told Detective Brock that, although Kenneth was not much of a loving person, he loved their grandchildren and she has never seen him hurt them. In both her first and second interviews, Appellant stated that it was approximately two or three minutes, "I don't know," from the time Kenneth got up from the couch until she saw B.W. with her burned feet. Towards the end of her second interview, the following exchange took place between Detective Brock and Appellant:

> Detective Brock: When you said that a couple minutes passed, is there a chance that she [B.W.] was crying because her and [N.W.] were fighting, Kenneth went in there, something happened, and he went to discipline her and this is what happened? Maybe he found them in the bathroom and—
>
> Appellant: I'm not saying that didn't happen. I'm not saying that didn't happen. I don't know.
>
> Detective Brock: But would you agree that there was enough time that has elapsed from the time that he got up to the time she came around the corner that something like that could have happened?
>
> Appellant: Honestly, I really don't know how much time that was because I just, everything was so fast, it's hard to remember each thing—the time.

### b. Kenneth's Recorded Interviews

In his first interview, Kenneth said that he had been lying on the couch when he heard B.W. crying. He described N.W. as "upset," but had not heard any water running and did not know how B.W. had gotten into the water. Kenneth explained that he had not paid attention to where Appellant was, and when he saw B.W., he "hollered" for Appellant, who then ran into the bathroom, saw the water, and picked up B.W. Kenneth said that he picked up N.W. and called 911. He explained, "When I ran in there, my wife wasn't coming out of the room, [B.W.] was coming out," and further stated, "There's no way my wife did it."

During his second interview, Detective Brock asked Kenneth to describe B.W. and N.W. He described B.W. as the "terrible twos" and said that N.W. has ADHD and autism. Kenneth said that the children get into things and that they had to put a lock on the outside of the bathroom door to prevent the children from going into the bathroom unattended. He told Detective Brock that he did not know what had happened, did not see N.W. come out of Appellant's bedroom, and did not think N.W. was in the bathroom with B.W. when she was

burned. However, he said that N.W. was "there with [B.W.] when she came out of the bathroom."[14]

During the interview, Kenneth was accused of being defensive to which he responded, "You're trying to accuse me of something I didn't do; [y]es, I'm being defensive. No way I'd harm that child."

*The Witnesses' Theories*

Dr. Wolf testified that part of his job as a surgeon is to "figure out how" a burn happened. Dr. Wolf ruled out the possibility that B.W. was standing in the bathtub as the water initially began to pool because B.W. would have suffered deeper burns to her toes. He also ruled out the possibility that water was continuing to fill the bathtub while B.W. was held in the water over a period of time. Dr. Wolf explained that this would have resulted in deeper burns on the bottom of B.W.'s feet because they would have been in contact with the water for a longer period of time. There also would have been a "mixed distribution" as opposed to a "uniform" burn. Dr. Wolf testified that B.W.'s injuries showed that she was "unable to get out of the water . . . for a prolonged period of time, however that occurred."

Dr. Cox testified, "I don't know exactly who did it. I don't have enough information to say who did what, just that she sustained forced submersion burns. I can't say who did it or how it occurred exactly." On cross examination, Dr. Cox was asked the following:

> Defense Attorney: So that leaves the only theory being, I guess according to your theory and the State's theory, is that; one, she either was in there accidentally and was walking around on her own, or; two, according to your theory, she was forcibly submerged in this hot water and held in place, but elevated, correct?
>
> Dr. Cox: I think that scenario is correct, yes.

Dr. Cox and Dr. Wolf maintained that B.W.'s burns were the result of forced submersion. Neither considered in making his assessment (1) the scratches on B.W.'s chest and leg, (2) the fact that the bathtub had a metal track surrounding the shower door, (3) the fact that the shower door was off its track, or (4) the Walkers' physical capabilities. Dr. Wolf testified that, in all probability, B.W.'s burns were "non-accidental, because a child would not typically stand in water that could scald her to this degree for ten to fifteen seconds without some struggle to get

---

[14] During the interview, Kenneth denied that the bathroom was hot and humid when he opened the door to show law enforcement where B.W. had been burned.

out and some signs thereof." Nevertheless, when asked whether it was probable that B.W.'s burns could be explained as being consistent with a child stepping into the water with the same temperature but the water was at a different level due to the slope of a bathtub, Dr. Wolf responded, "[T]here are other explanations that are as probable."[15]

Detective Brock testified that she believed both Appellant and Kenneth were capable of forcibly submerging B.W. in the water without having her feet touch the bathtub's surface. She believed that they both held B.W. to keep her feet in the water for an extended period of time. Detective Brock further testified that the Walkers were guilty because they had given inconsistent stories about what happened and that they "blew up" because N.W. had behavioral issues and they were frustrated. The prosecutor disagreed with Brock's theory of how B.W. was held by the Walkers at the same time, and used a twenty-seven pound doll to demonstrate how Appellant or Kenneth could have held B.W. to cause the injuries she sustained. Brock agreed that the prosecutor's demonstration could indicate how either one of the Walkers could have held B.W. On cross examination, the following discourse took place:

> Defense Attorney: Detective Brock, [B.W.] slides in that water, and [N.W.] is standing right there (indicating) throwing things in the tub or preventing her from getting in [sic] the tub, that's certainly a possibility of how she burned herself, isn't it?
>
> Detective Brock: It could be a possibility.
>
> Defense Attorney: You didn't give that much weight at all, did you?
>
> Detective Brock: They were still in the care, custody, and control of Mr. and Mrs. Walker.
>
> Defense Attorney: Okay. So if an accident happens—I guess your testimony is, if an accident—if they're in an accident and in your care, custody or control, you're going to jail. Is that what you're saying?
>
> Detective Brock: I'm just saying the evidence—there was enough probable cause for an arrest warrant.

Officer Weaver testified that when he arrived on the scene, he was thinking that the only way B.W.'s feet could have been burned "if it was an accident . . . was for that child to go into

---

[15] When Dr. Wolf was asked whether it was "very unlikely" for someone to "first forcibly hold [B.W.] without pushing her down to the bottom of the tub . . . and restrain her for up to 15 seconds," he answered, "It is as plausible as anything else."

that water with both feet at the same time and stand there and not move."[16]  Officer Weaver also agreed that B.W.'s burns did not appear to have a straight line and could be consistent with walking through water and creating small waves.[17]

Dr. Lawrence testified that he had spent over thirty hours reviewing offense reports, photographs, and videos in reaching his conclusion that B.W.'s injuries were an accident.  In explaining the significance of the higher burn on B.W.'s left leg, Dr. Lawrence explained that the depth of the bathtub would create a burn that went up higher on her left leg if B.W. was facing towards the outside of the bathtub.[18]  Dr. Lawrence explained that these facts, when viewed in light of the tracks along the bathtub that was capable of causing scratches and the fact that B.W. had scratches on her chest and leg that appeared fairly new, showed that

> in this particular case, if the child was in the back of the tub, she could not get out any other way but the front of the tub.  And now in order to get out, she has to have an unobstructed view.
>
> So it's possible that you had [N.W.] standing there.  It's possible the door was a little bit, you know, closed because it closes that, or it could very well been that it wasn't.
>
> She's going to have to get out through that.  There's no other way out of that tub but through the front.  And as she walks forward, she burns her feet.  She's going to grab whatever she can to get herself out of that tub.
>
> And she dislodges, and it looks like what you see in dislodging that door as you pull on it, and you would scrape on her right side of her leg and her shoulder, consistent with the scrapes you see on that railing.  And she probably just rolled right over onto the floor to get out of that tub.
>
> So that's why those scratches are significant in terms of the dynamics that look to have taken place here.

Dr. Lawrence later clarified that the scratches were on B.W.'s left side of her leg and chest.  Dr. Lawrence's hypothesis was supported by Dr. Cox's earlier testimony that a child would probably "div[e]" or "tumbl[e] out" or do "whatever" they could to get their feet out of scalding hot water.

---

[16] The testimony showed that Weaver believed the child did not move because there were no splash marks, but testimony from Dr. Wolf and Dr. Cox showed that water had to be greater than 130 degrees to cause splash marks.  Undisputed evidence showed that pooled water in Walker's bathtub reached only 129 degrees when the water heater was turned to its highest setting.

[17] During this portion of his testimony, Officer Weaver was referring to B.W.'s burns as depicted in defense exhibit 8.

[18] Dr. Wolf's testimony also showed that the burn to B.W.'s left leg was "somewhat higher than the right."

**Conclusion**

Conflicting inferences may be drawn from the evidence in this case—B.W.'s injuries are the result of (1) forced submersion, or (2) an accident in which B.W. entered a bathtub containing scalding water and could not immediately exit.

It is undisputed that B.W. and N.W. had not taken the Walkers' attempts at discipline seriously because the children would laugh when they were disciplined. It is also undisputed that the children had a history of playing with water in the bathrooms and had flooded Appellant's bathroom the week before B.W. was injured. These facts, when viewed in light of the prosecution's demonstration and testimony that B.W.'s burns were more consistent with forced submersion than an accidental burn, support the inference that, upon finding B.W. playing in Appellant's bathroom with the water running and soaps thrown into the bathtub, Appellant disciplined B.W. by holding her feet in the scalding water.

B.W. had a scratch on her chest and leg that could have been consistent with her diving out of the bathtub (which could have also explained the fact that the shower door was off its track). Moreover, Appellant had several health conditions that could have made the forced submersion of B.W. difficult. However, these facts do not render the jury's verdict speculative. *See **Hooper***, 214 S.W.3d at 16. Detective Brock's testimony showed that it would have been possible for Appellant to forcibly submerge B.W. in scalding water because Appellant was mobile and able to move around.

Although the existence of the scratch on B.W.'s chest and leg is undisputed and Appellant in her recorded interview insisted that B.W.'s injury was an accident, we must defer to the jury's credibility and weight determinations. *See **Jackson***, 443 U.S. at 319, 99 S. Ct. at 2789; ***Brooks***, 323 S.W.3d at 899. After viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable fact finder could have inferred that it was Appellant's conscious or objective desire to cause the burn to B.W.'s feet, or that Appellant was aware that the forced submersion of B.W.'s feet was reasonably certain to cause bodily injury. *See* TEX. PENAL CODE ANN. § 6.03(a), (b); ***Williams***, 235 S.W.3d at 750; ***Kelley***, 968 S.W.2d at 399. Accordingly, we overrule Appellant's first issue.

In her second issue, Appellant contends that the evidence is "legally insufficient to support the jury verdict that this was serious bodily injury." She argues that B.W.'s injuries would have risen to the level of serious bodily injury only if the burns had been left untreated. She argues that because emergency services were contacted, the evidence is legally insufficient to establish the specific element of intent to cause serious bodily injury.

## Applicable Law

"Serious bodily injury" is bodily injury "that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07 (a)(46) (West Supp. 2014). "Bodily injury" is defined as "physical pain, illness, or any impairment of [the] physical condition." *Id.* § 1.07(a)(8).

In assessing the sufficiency of the evidence to establish serious bodily injury, the question is the degree of risk of death that the injury caused, or the disfiguring or impairing quality of the injury, "as it was inflicted, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment." *Stuhler v. State*, 218 S.W.3d 706, 714 (Tex. Crim. App. 2007) (citations omitted).

## Discussion

B.W. underwent surgery to remove the dead skin from her feet the day after she arrived at Parkland Hospital. She remained in the hospital "about a week" before CPS could secure a placement that could meet her medical needs.

Dr. Wolf confirmed that the main concern for B.W.'s burns was pain management, but further stated, "And then I believe there was some infection underneath that stuff we put on, but that was removed, and the course was as expected." Dr. Wolf testified that if left untreated, B.W.'s burns would qualify as serious bodily injury because "it has a relatively high risk of infection and ongoing systemic problems with that, perhaps even death, if left untreated. If treated, it is relatively straightforward." Dr. Cox testified that he was familiar with the definition of "serious bodily injury" and stated that, in his opinion, B.W.'s injuries were "consistent with serious bodily injury."

**Conclusion**

After viewing the evidence in the light most favorable to the verdict, we conclude that the testimony at trial showed that the degree of B.W.'s injury caused a substantial risk of death if left untreated and constituted "serious bodily injury." *See* TEX. PENAL CODE ANN. § 1.07(a)(46); *Stuler*, 218 S.W.3d at 714. Accordingly, we overrule Appellant's second issue.

**IMPROPER ARGUMENT**

In her third issue, Appellant contends that her right to a unanimous jury verdict was violated because the prosecution repeatedly told the jury that it did not have to agree on who committed the offense. Although Appellant frames the issue in terms of being denied a unanimous verdict, she complains only of the prosecutor's comments during opening and closing statements and does not allege any actual charge error. Thus, we construe Appellant's third issue as an assertion of improper argument.

In preserving error for appellate review, the complaining party must make a timely, specific objection and obtain a ruling. *See* TEX. R. APP. P. 33.1; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Absent an adverse ruling of the trial court that appears in the record, there is no preservation of error. *Darty v. State*, 709 S.W.2d 652, 655 (Tex. Crim. App. 1986) (en banc); *see also* *McGowan v. State*, No. 12-12-00056-CR, 2013 WL 1143240, at *2 (Tex. App.—Tyler 2013, no pet.) (mem. op., not designation for publication). "[A]n objection to improper argument must be made at the time of the argument in order to preserve the error for review." *Collins v. State*, 548 S.W.2d 368, 377 (Tex. Crim. App. 1976).

Appellant contends that the prosecutor in this case engaged in improper argument during both his opening and closing statements. However, no objection was made when the prosecutor made the alleged improper arguments. Consequently, this error has not been properly preserved for appellate review. *See id.* Accordingly, we overrule Appellant's third issue.

**DISPOSITION**

Having overruled Appellant's three issues, we *affirm* the judgment of the trial court.

**SAM GRIFFITH**
Justice

Opinion delivered September 17, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 17, 2014**

**NO. 12-12-00379-CR**

**SHELLEY WALKER,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 241st District Court

of Smith County, Texas (Tr.Ct.No. 241-0593-12)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*