

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00344-CR

Juan Ruben **SANCHEZ-CERDA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 229th Judicial District Court, Starr County, Texas
Trial Court No. 14-CRS-372
Honorable J.R. "Bobby" Flores, Judge Presiding

Opinion by: Rebeca C. Martinez, Justice

Sitting: Karen Angelini, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: July 6, 2016

AFFIRMED

A jury found appellant, Juan Ruben Sanchez-Cerda, guilty of murder and assessed punishment at thirty-eight years' confinement. The judgment includes an affirmative finding on a deadly weapon. In three issues on appeal, Sanchez-Cerda asserts (1) the evidence is insufficient to support the jury's verdict, (2) the trial court erred by admitting evidence of a prior federal conviction for illegal reentry into this country, and (3) the trial court erred in making an affirmative deadly weapon finding in the judgment. We affirm.

**BACKGROUND**

On the evening of March 22, the complainant, Saul Ruvalcaba, was celebrating his birthday at his house with his friends and neighbors. Sometime in the early morning hours of March 23, Ruvalcaba was fatally stabbed.

Ruvalcaba's wife, San Juana Garza, testified Sanchez-Cerda would park his car on their property and she had asked her husband to tell Sanchez-Cerda not to park there. Garza said she did not know why Sanchez-Cerda parked his car on their property, but she thought it was because he was seeing Rosario Rodriguez who lived in a nearby house. Garza testified that about a week before March 22, barriers had been erected on her property by the owners of the apartments where she and Ruvalcaba lived to prevent cars from using the property as a drive-through at night.

Garza testified that shortly after midnight she heard "a struggle, like there were lots of — there was noise and there were rocks and [she] could hear that somebody was struggling." She said she did not hear any argument or yelling. Garza said she stepped outside and called her husband's name. When he did not respond, she went outside and saw Sanchez-Cerda run away and get into a car. Garza found her husband lying on the ground.

Alvaro Cervantes, a friend who was at Ruvalcaba's home the evening of the stabbing, said he, Ruvalcaba, and another man were all visiting at Ruvalcaba's home when Ruvalcaba decided to leave. Cervantes testified that while Ruvalcaba was away, Sanchez-Cerda stopped by and asked if anyone had seen his children. When they told him "no," Sanchez-Cerda left. As Sanchez-Cerda was leaving, Ruvalcaba returned. Ruvalcaba then left again to buy beer. After a short time, Sanchez-Cerda returned carrying his own beer and the men all talked. At some point during the evening, Sanchez-Cerda and Cervantes decided to drive in Sanchez-Cerda's car to a near-by store to buy more beer and snacks. When they returned, Cervantes went inside another friend's apartment to use the bathroom, while Ruvalcaba went to his own apartment. While in the

bathroom, Cervantes heard a woman screaming. When he went outside to investigate, Sanchez-Cerda ran past him. Cervantes said Sanchez-Cerda "seemed to be desperate and to be in a hurry." Cervantes said he did not see Ruvalcaba with a knife at any time that evening, and he saw no knife on the ground after the stabbing.

Rosario Rodriguez testified she knew Ruvalcaba for about five years and he was not a violent person. She said her affair with Sanchez-Cerda began about one year before the stabbing, and she knew Sanchez-Cerda's wife, children, and sister. Rodriguez said her friendship with Sanchez-Cerda's wife, with whom she worked, ended when his wife discovered the affair. She said his wife assaulted her and came to Rodriguez's house many times to insult her. She also stated that Ruvalcaba's teenage son broke into her house almost a year before the stabbing. At this time, her own husband (Oscar) was in prison. She said Sanchez-Cerda told her that Ruvalcaba might tell Oscar "something" when he returned home from prison. She stated she talked to Sanchez-Cerda about the fact the Ruvalcaba was the only person who could tell Oscar about the affair. She said Sanchez-Cerda knew her husband was a jealous man and Sanchez-Cerda thought Ruvalcaba "was a tattle-tail."

Rodriguez testified she last saw Sanchez-Cerda about a week before the stabbing when he parked behind Ruvalcaba's house and came to see her at about 5:00 a.m. in the morning. In the week leading up to this meeting, she had ignored Sanchez-Cerda's telephone calls. She said she wanted to continue the relationship even after her husband was released from prison.

Various law enforcement investigators testified as follows. Sanchez-Cerda's house was about four or five blocks from where Ruvalcaba's body was found. Sanchez-Cerda's car was found at the Rio Motel about twelve hours after officers arrived at the crime scene, and four law enforcement offices were located between the motel and the crime scene. Sanchez-Cerda was not at the motel.

On the morning of March 25, Sanchez-Cerda turned himself in to the police. Two interviews were videotaped at the police station.[1] Sanchez-Cerda told investigators he waited to turn himself in because he was "trying to think of what he should do." He did not explain to the officers why he did not stop at any of the four law enforcement offices he passed on his way to the Rio Motel, and instead, he called his sixteen-year-old son and asked him to bring a change of clothing to the motel. Sanchez-Cerda's son drove Sanchez-Cerda from the motel to the home of a friend. In his recorded interview, Sanchez-Cerda explained he was "thinking people were going to say I intentionally murdered him and I don't know what [sic] going to happen to me so let me just think about things a little to clear my mind and later I will fix things and then I left thinking about everything and called my son . . . ." He said he left his car at the motel because his son told him the police were already looking for the vehicle.

In addition to the two interviews, an audio/video recording was taken of a walk-through of the crime scene conducted by the police with Sanchez-Cerda. On this audio, Sanchez-Cerda can be heard telling the investigating officers that Ruvalcaba "did something with the knife," Sanchez-Cerda told him to "calm down," and then Ruvalcaba fell down and Sanchez-Cerda said "Oh my God, what happened." Sanchez-Cerda told the officers, "So he did like this and then he pulled it out and he let himself fall. He tried to grab me still, but he kept on. He pushed me like this." Sanchez-Cerda told the officers he did not call 911 because he "was afraid and scared and did not know exactly what to do." Instead, he drove away from the scene of the stabbing. During the course of the walk-through with the police, Sanchez-Cerda led officers to a location where his clothing could be found near the Rio Motel. However, the investigators never found the knife.

---

[1] The jury watched the video of the interviews. The interviews were conducted in Spanish and the jury was provided transcripts of the interviews translated into English.

During one of the interviews, Sanchez-Cerda said on the evening of the stabbing, Ruvalcaba confronted him about why he did not greet him by saying "hi" on another occasion, and Sanchez-Cerda merely replied, "I don't want problems." Sanchez-Cerda said Ruvalcaba hit him in the chest with his hand and continued to confront Sanchez-Cerda about not saying "hi." Sanchez-Cerda explained:

> . . . I said well the truth is I don't like your [Ruvalcaba's] attitude and he [Ruvalcaba] said what do you mean no and I insisted that I didn't want problems so he again charged against me so I said I'm leaving and I pushed him so he pulled a knife he took the knife out I don't know how he did some weird moves and took it out and I said take that thing down.

> What color was it? I don't remember, I just saw shiny just shiny, ok. So we went to the alley way it was darker there so I did this and I was going back and I thought if I run he is going to hit me through my back so I said let me attempt to remove the knife and he did this and I grabbed him and we were still fighting for it like this, this way and that way so I felt a big push and then when I knew it was in I backed off, and he stood up but his body had no force, he fell to the floor and then . . . someone shouted from inside Saul what wrong and I was scared and just went back back back and Varo [Cervantes] was coming out of the house and he said what happened and I said "Ya Valio Madre" (it's done or I'm screwed) and I was scared right and I kepts [sic] saying and went to my car and turned it on and I left.

According to the investigator who testified about the interviews, Sanchez-Cerda had no injuries related to an alleged knife attack. The investigator also opined that the physical evidence did not support Sanchez-Cerda's version of the events. The investigator testified Sanchez-Cerda described how Ruvalcaba attacked him by trying to stab him with a knife by swinging the knife in back and forth motions. The investigator testified that if an individual is attacked by someone swinging a knife, it is likely the person being attacked would have contact with the knife and sustain injuries. He said it was unlikely a victim could defend himself without coming into close contact with the knife if attacked in the manner described by Sanchez-Cerda. He also thought it "not believable" that someone who had consumed at least ten twenty-four ounce beers throughout

the day of the stabbing—as Sanchez-Cerda said he had done—would have been able to escape injury while defending himself in a knife attack.

One of the investigators admitted that his initial report stated Ruvalcaba had been stabbed several times, when, in fact, an autopsy later revealed he had been stabbed only once. This investigator explained his initial report was based on what another investigator told him while at the crime scene and they assumed there were several stab wounds based on "the amount of blood actually on the floor." Ruvalcaba's shirt, underwear, sports shorts, and shoes were stained with his blood. Based on the location of the single stab wound and the place on the shirt where the knife entered, one investigator opined Ruvalcaba and Sanchez-Cerda were struggling when Ruvalcaba was stabbed.

A State forensic scientist testified blood was found on Sanchez-Cerda's blue-jean pants, shirt, and work boots. A State DNA analyst testified the DNA profile of each blood sample taken from Sanchez-Cerda's clothing and shoes was consistent with Ruvalcaba's DNA profile—in other words, the blood all came from the victim and none from Sanchez-Cerda. Dr. Fulgencio Salinas, who prepared the autopsy on Ruvalcaba, testified Ruvalcaba suffered a single stab wound to the left side of his chest caused by a single-edged blade, which penetrated about four and one-half inches. He said the knife penetrated both ventricles of the heart. Dr. Salinas said Ruvalcaba had a .15 level of alcohol in his system, as well as a minimal level of cocaine. He opined that this level of alcohol would depress a person's coordination, strength, ability to respond, and judgment. Based on the low level of cocaine in his system, Dr. Salinas also opined that Ruvalcaba was probably on his way down from an initial high. He characterized the knife as a deadly weapon.

A jury found Sanchez-Cerda guilty of murder and the trial court signed a judgment that included an affirmative finding on a deadly weapon.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Sanchez-Cerda asserts the record is devoid of any evidence that links him to Ruvalcaba's murder.[2] The entirety of Sanchez-Cerda's argument on appeal is that the State produced no eyewitness testimony to the alleged murder and that "[d]espite all the blood that resulted from the alleged stab[bing] of the victim, a reasonable person would think that the blood evidence connecting [Sanchez-Cerda] to the crime would be much more substantive that what it is."

### A.  Standard of Review and Applicable Law

Due process requires the State to prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (determining *Jackson* standard "is the only standard that a reviewing court should apply" when examining sufficiency of evidence).  When considering the sufficiency of the evidence, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.  We must resolve any inconsistencies in the evidence in favor of the jury's verdict, deferring to its assessment of the credibility and weight of the evidence. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  A jury is entitled to resolve any inconsistencies in the evidence, and is free to accept or reject all, some, or none of any witness testimony. *Chambers v. State*, 805 S.W.2d 459,

---

[2] The jury charge included instructions on whether Sanchez-Cerda's use of force was in self-defense.  On appeal, Sanchez-Cerda does not specifically assert the evidence is insufficient to support the jury's implicit rejection of his claim that he acted in self-defense.

461 (Tex. Crim. App. 1991); *Zuniga v. State*, 393 S.W.3d 404, 413 n.2 (Tex. App.—San Antonio 2012, pet. ref'd).

The essential elements of the crime are the elements of the offense as defined by the hypothetically correct jury charge for the case, which is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law as "authorized by the indictment" consists of the statutory elements of the offense as modified by the charging instrument. *Johnson*, 364 S.W.3d at 294; *Curry*, 30 S.W.3d at 404.

The offense of murder is committed when a person intentionally or knowingly causes the death of an individual, or when he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (murder is a result-of-conduct offense that requires the culpable mental state relate to the result of the conduct, *i.e.*, causing the death). The jury was instructed that it could convict Sanchez-Cerda of murder if it found beyond a reasonable doubt that he intentionally or knowingly caused the death of Saul Ruvalcaba by stabbing him in the chest with a deadly weapon, a knife.

## B. Analysis

In this case, the jury was free to reject some or all of Sanchez-Cerda's version of the events leading to the fatal stabbing. At the same time, the jury was free to accept the investigating officers' opinion that the evidence did not support Sanchez-Cerda's version of the events because Ruvalcaba's system would have been depressed due to alcohol and cocaine use, and Sanchez-Cerda sustained no injuries consistent with fending off a knife attack. Also, there is no dispute

Sanchez-Cerda drove away from the scene of the stabbing, did not report the knife fight to law enforcement, abandoned his vehicle at a motel after he was told the police were looking for the vehicle, and stayed at a friend's house before turning himself in to the police. *See Clayton v. State*, 235 S.W.3d 772, 780-81 (Tex. Crim. App. 2007) (jury may draw inference of guilt from defendant's flight as it evinces a consciousness of guilt).

Having reviewed all of the evidence in the light most favorable to the verdict, we conclude the factfinder rationally could have found each element of the offense beyond a reasonable doubt. As such, the evidence is sufficient to support Sanchez-Cerda's conviction for murder.

## EVIDENCE OF FEDERAL CONVICTION

In his second issue, Sanchez-Cerda asserts the trial court erred by admitting into evidence his federal conviction for illegal reentry.

During defense counsel's cross-examination of Investigator Lopez about Sanchez-Cerda's decision to turn himself in to the police, the following occurred:

> Q. Well, the law enforcement community didn't go for him, didn't catch him?
> A. Correct.
> Q. Okay. He came in by himself?
> A. Yes, sir.
> Q. All right. And the law enforcement community knows that he has no papers. He could have just taken off to Mexico, right?
>
> [State's relevance objection overruled]
>
> Q. You know when you were investigating, you were talking to him on this video that he had no papers to be in the United States, he could have . . . fled to Mexico, right?
> A. After the interview, yes, sir.
> Q. All right. But he decided to stay and tell his story, right?
> A. Yes, sir.

On redirect examination, the State asked Lopez about a State's exhibit, which was a document that included Sanchez-Cerda's immigration status. Lopez testified the exhibit showed on the State of Texas site that Sanchez-Cerda was a U.S. citizen, but on the federal site that

Sanchez-Cerda had two federal convictions. Defense counsel then objected to the document on the grounds that the exhibit was hearsay, not relevant, and was "403 material." It is unclear from the record whether defense counsel also raised an objection under Texas Rule of Evidence 609, but the trial court asked the State if it was trying to impeach Sanchez-Cerda under that rule.

The State argued defense counsel had opened the door to the line of questioning when defense counsel introduced Sanchez-Cerda's nationality and legal status. According to the State, defense counsel tried to show Sanchez-Cerda's good character by eliciting Lopez's agreement that Sanchez-Cerda could have fled to Mexico but decided to stay in the U.S. and tell his story. According to the State, Sanchez-Cerda's criminal history would impeach Sanchez-Cerda by showing he had once been deported and later returned to the U.S. illegally. The trial court did not rule on defense counsel's relevance, hearsay, or "403 material" objections. Instead, the trial court allowed the State to introduce evidence that Sanchez-Cerda "[has] been here before illegally." The exhibit was not admitted into evidence or otherwise shown to the jury.

Following the trial court's ruling, Lopez continued to testify as follows:

Q. (on direct examination) . . . [H]as [Sanchez-Cerda] ever been charged with a federal offense regarding his status in this country?
A. Yes, sir. He does show a conviction and he was sentenced to 18 months in federal custody back in 2012.

Q. (on cross-examination) He was convicted because he does not have any status in the United States, right?
A. Correct.
Q. And that same document says that he's a Mexican citizen of Mexico, right?
A. Well, the federal part of it does show, yes, he is — is illegally, but then the State one says he's a citizen so —
Q. Well, that's a document, but because, I mean, somebody gets convicted for entering the country illegal[ly] on the federal [sic] because he doesn't have status in the United States, right?
A. Correct.
Q. He's a citizen of Mexico?
A. Correct.
Q. So I'm right. He could have fled to Mexico. He could have been in Mexico, right?

A. Yes, sir, he could have.
Q. Nothing would have prevented him?
A. No, sir.

Rule 609 provides that "[e]vidence of a criminal conviction offered to attack a witness's character for truthfulness must be admitted if: (1) the crime was a felony or involved moral turpitude, regardless of punishment; (2) the probative value of the evidence outweighs its prejudicial effect to a party; and (3) it is elicited from the witness or established by public record." TEX. R. EVID. 609. However, in this case, the State was not attempting to impeach its witness's (Lopez's) testimony, Sanchez-Cerda did not testify, and the report about the criminal record itself was not established as a public record,[3] nor was it admitted into evidence.

Although Rule 609 may not have been applicable here, we review a trial court's decision to admit evidence for abuse of discretion and will uphold the decision so long as it is correct under any theory of law that finds support in the record even if the trial court gave the wrong reason for its correct ruling. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Therefore, we consider whether the trial court's ruling was correct under Rule of Evidence 404(b).

Under Rule 404, evidence of extraneous acts or crimes committed by a defendant is generally inadmissible at the guilt-innocence stage of trial. *See* TEX. R. EVID. 404(b)(1); *see also Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). However, such evidence may be admissible for purposes other than character conformity. *Moses*, 105 S.W.3d at 626; *see also* TEX. R. EVID. 404(b)(2). Evidence of extraneous offenses may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Although this rule enumerates specific purposes for which such evidence is admissible, the list of exceptions is neither exclusive nor collectively exhaustive.

---

[3] Lopez testified only that the State's exhibit was "the criminal history . . . for [Sanchez-Cerda]."

*Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). One unlisted exception is to refute a defensive theory. *Dabney v. State*, 816 S.W.2d 525, 527 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd); *Wiggins v. State*, 778 S.W.2d 877, 881 (Tex. App.—Dallas 1989, pet. ref'd). "A trial court's ruling on whether extraneous-offense evidence was admissible to rebut a defensive theory should be upheld if it is within the zone of reasonable disagreement." *Dabney v. State*, No. PD-1514-14, 2016 WL 3193020, \*7 (Tex. Crim. App. June 8, 2016).

Because Sanchez-Cerda did not take the stand, defense counsel introduced through Lopez's testimony the defensive theory that Sanchez-Cerda chose to stay in the U.S. and turn himself in to the police because he did not intentionally or knowingly cause Ruvalcaba's death.[4] *See Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002) ("As a general rule, the defensive theory that the State wishes to rebut through the use of extraneous offense evidence must be elicited on direct examination by the defense and may not be elicited by 'prompting or maneuvering' by the State."). As a result, the State was entitled to rebut the defensive theory that Sanchez-Cerda was innocent of the charged offense because he choose not to flee to Mexico by introducing evidence that Sanchez-Cerda had once before left the U.S. only to later illegally return. We conclude the trial court did not abuse its discretion by allowing Lopez to testify regarding Sanchez-Cerda's illegal reentry into the U.S.[5]

---

[4] During closing arguments, defense counsel argued Sanchez-Cerda could have gone to Mexico, but instead, chose to turn himself into the police and lead them to his bloodied clothes.

[5] Because Sanchez-Cerda did not obtain an adverse ruling on his relevance, hearsay, and "403 material" objections, any complaint that the testimony regarding his federal conviction was not relevant or was hearsay is waived. *See* TEX. R. APP. P. 33.1(a)(1) (providing that a party must object and obtain trial court's adverse ruling).

**DEADLY WEAPON AFFIRMATIVE FINDING**

In his final issue, Sanchez-Cerda asserts that because the jury did not make an affirmative deadly weapon finding, the trial court erred in doing so. Sanchez-Cerda contends such a finding can only be made a jury.

It is true that there must be an express finding of a deadly weapon when the jury is the factfinder. *Lafleur v. State*, 106 S.W.3d 91, 92 (Tex. Crim. App. 2003). However, when "the indictment by allegation specifically places the issue before the trier of fact (*i.e.* '. . . . by stabbing him with a knife, a deadly weapon . . . .'), then an affirmative finding is de facto made when the defendant is found guilty 'as charged in the indictment.'" *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985); *see also Lafleur*, 106 S.W.3d at 98 (concluding "that *Polk's* purpose of ensuring an 'express finding' of a deadly weapon is satisfied by looking to the explicit requirements of the application paragraph as well as to the indictment and verdict form"). Further, nothing "prohibit[s] courts from referring to the application paragraph of the jury charge to determine if the jury has made an express deadly weapon finding." *Lafleur*, 106 S.W.3d at 99. The *Lafleur* court determined that a combination of: (1) an indictment that alleged use of a deadly weapon; (2) an application paragraph of the jury charge of lesser included offense of manslaughter that required a finding, beyond a reasonable doubt, that defendant used a deadly weapon; and (3) the jury's verdict that appellant was guilty of the lesser included offense of manslaughter, constituted an express finding that defendant used a deadly weapon to cause the victim's death. *Id.*

A similar "combination" relied upon in *Polk* and *Lafleur* for an express finding on the use of a deadly weapon exists in this case. The indictment alleged Sanchez-Cerda intentionally and knowingly caused Ruvalcaba's death "by stabbing him in the chest *with a deadly weapon, to-wit: a knife*." [Emphasis added.] The jury charge instructed the jury as follows:

. . . if you believe from the evidence beyond a reasonable doubt that [Sanchez-Cerda], on or about the 23rd day of March, 2014 in Starr County, Texas, *as alleged in the indictment*, did then and there intentionally or knowingly cause the death of an individual, namely, [Ruvalcaba], by stabbing him in the chest with *a deadly weapon, to-wit: a knife* you will find [Sanchez-Cerda] guilty of the offense of murder. . . . . [Emphasis added.]

The jury found Sanchez-Cerda "guilty of the offense of MURDER, *as charged in the indictment . . . .*" [Emphasis added.]

In this case, the combination of the indictment, the jury charge application paragraph, and verdict form constituted an express finding that Sanchez-Cerda used a deadly weapon to cause Ruvalcaba's death. When a jury makes an affirmative deadly weapon finding, the trial court has a mandatory duty to enter a deadly weapon finding in the written judgment. TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2) (West Supp. 2015); *see Lafleur*, 106 S.W.3d at 94; *Farmer v. State*, 04-12-00155-CR, 2013 WL 3197664, at *1 (Tex. App.—San Antonio June 26, 2013, pet. ref'd) (not designated for publication). Accordingly, here, the trial court did not err by including a deadly weapon finding in its judgment.

## CONCLUSION

We overrule Sanchez-Cerda's issues on appeal and affirm the trial court's judgment.[6]

Rebeca C. Martinez, Justice

Do not publish

---

[6] We decline appellate counsel's request that this court "address any issues that it might help the [A]ppellant just because an issue was not briefed that does not mean that it is waiving said issues anyway by the Appellant." *See* TEX. R. APP. P. 38.1(i) (requiring issues to be adequately briefed on appeal with citations to the record or the issue is waived).